UNITED STATES of America,
Plaintiff-Appellee,

v.

C. Wayne PRATER,
Defendant-Appellant.

Nos. 85–3676 and 85–3677.

United States Court of Appeals,
Eleventh Circuit.

Dec. 15, 1986.

---

4. *See Dimenstien v. Whiteman,* 759 F.2d 1514, 1517 (11th Cir.1985).

Charles R. Wilson, Tampa, Fla., for Prater.

Karla Spaulding, Asst. U.S. Atty., Tampa, Fla., Louis M. Fischer, Appellate Sect., Criminal Div., Washington, D.C., for plaintiff-appellee.

Before RONEY, Chief Judge, GODBOLD, Circuit Judge, and ATKINS *, Senior District Judge.

ATKINS, Senior District Judge:

Defendant, Wayne Prater, appeals from a jury verdict in which he was found guilty on all counts of consolidated actions involving two indictments.[1] He as-

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Defendant was convicted under one indictment on one count of wire fraud (18 U.S.C. § 1343), four counts of causing false entries to be made in the books and records of a financial institution (18 U.S.C. § 1006), two counts of misapplying funds of a financial institution (18 U.S.C. § 657), and two counts of transporting, in interstate commerce, property taken by fraud. He was also convicted of one count of making a false statement in connection with a loan application (18 U.S.C. § 1014) under a sep-

serts four challenges to his conviction. First, he argues that the government failed to prove he was "connected in any capacity" with a savings and loan association. Second, he urges that the trial court improperly admitted evidence of "losses" or "write-downs" taken by Independence Investment Corporation.[2] Third, he maintains that the evidence was insufficient to support the jury's verdict.[3] Finally, he asserts that the court erred by failing to grant his motion to dismiss the indictment.[4] After carefully considering each of defendant's arguments, WE AFFIRM.

## I

The facts are reasonably complicated. In general, they concern various financial schemes employed by defendant which involved several corporate entities. From the evidence presented at trial, the jury was entitled to conclude that defendant used his position as president and chief executive officer of Independence Investment Company ("IIC"), a wholly owned subsidiary of Freedom Savings and Loan Association ("Freedom"), to obtain funds and property owned by Freedom and IIC.

Defendant was selected to operate IIC in August of 1980 when Freedom's board of directors decided to diversify its holdings. IIC was specifically designed to capitalize on profitable real estate opportunities, and it specialized in real estate development. Freedom's board also established various subsidiaries under IIC to perform associated functions.

In February of 1983, a mobile home park known as the Heritage Wood "N" Lakes Estates, Inc. ("Heritage") encountered severe financial difficulties. Around February 15, Mr. Fleck accompanied defendant to the Southeast Bank in Orlando to discuss a million dollar loan for Heritage.[5] Defendant, representing IIC, offered to give an IIC guarantee for the loan. Solely because of that IIC guarantee, the loan was approved by the bank.[6]

The bank, of course, assumed that defendant had discussed the guarantee with IIC's board of directors. However, the board never approved the guarantee. Instead, shortly before the date of closing on the loan, defendant had Mark Siegel, the corporate secretary for IIC and several of its subsidiaries, sign a resolution purporting to show the IIC board's approval of the guarantee on March 29, 1983. Siegel was unaware of such a board meeting, but took defendant at his word and signed this resolution.

In April 1983, defendant arranged for IIC to lend two million dollars to USA Corporation, a holding company formed by Henry Isaksen and Larry Rigby. The loan

---

arate indictment. He was sentenced for a total of 10 years and fined $66,000.00.

2. The trial court permitted witnesses to testify about "write-downs" taken by defendant's company as requested by the Federal Home Loan Bank Board. The implication of this evidence was that defendant's investment activity caused the corporation to suffer losses. We agree that this evidence was irrelevant and prejudicial; however, under the circumstances it did not constitute reversible error.

3. Defendant's contention has little merit. This court must review the facts in the light most favorable to the government. *See Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1940). Moreover, all credibility choices must be resolved in favor of the jury's verdict. *See United States v. Smith,* 700 F.2d 627 (11th Cir.1983). With this in mind, we conclude that the evidence was such that a reasonable juror could have found defendant guilty beyond a reasonable doubt. *See United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) *(en banc).*

4. We reject defendant's assertion. The indictment was sufficient to give defendant notice of the charges against him, and permitted him to raise a double jeopardy bar to future prosecutions. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *Russell v. United States,* 369 U.S. 749, 763–65, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962). Therefore, the trial court's ruling was correct.

5. Because IIC had lent money on this project, defendant assigned Robert Fleck to become president of Heritage. Mr. Fleck already headed up the Independence Construction Company and Sun Bay Realty which were subsidiaries of IIC.

6. Heritage's own resources were inadequate to justify a loan of this magnitude.

enabled them to take control over Interlake Thrift in Salt Lake City, Utah. In addition, $375,000 was to be a nonrefundable deposit for the purchase of a condominium project in South Carolina, known as Cameo Properties, then owned by IIC. In connection with the loan, Isaksen and Rigby signed a loan agreement and a promissory note. They also pledged as collateral the Interlake Thrift stock, the proceeds from the sale of an Interlake asset, and the contract for a Dallas apartment house. Finally, they signed a separate agreement to purchase the Cameo Properties condominium project.

Though the primary purpose of the loan was the acquisition of Interlake Thrift, defendant did not inform IIC's board of directors of this fact. Instead, defendant telephoned three members of the IIC board and represented to them that the loan to USA corporation was to enable that company to syndicate two purchased debentures in Haven Savings and Loan, Winter Haven, Florida (in which Freedom had an interest), and that the stock of the Utah thrift institution would be additional collateral for the loan.[7] On those representations, the loan was approved. When the proceeds were issued, however, it was in the manner originally agreed upon—$1.5 million went for Interlake's purchase, while $375,000 was credited as a deposit on Cameo Properties, and the remainder went for fees and costs.

After Isaksen and Rigby acquired Interlake Thrift, defendant joined them on its board of directors. Soon it became apparent that USA Corporation would be unable to meet the terms of the loan which called for complete repayment in 90 days. The three men then discussed, and entered into a settlement agreement. Under the terms of the agreement, Interlake's stock was forfeited to IIC, but the $375,000 deposit on Cameo Properties was credited as paid in full. Thus, the stock transfer satisfied the entire obligation. Despite this agreement, however, defendant never informed anyone at IIC that it had acquired Interlake's stock.[8] Defendant then took control of the Thrift, and removed Isaksen, Rigby and two other members from the board of directors.

At the same time the parties entered into the settlement agreement regarding Interlake Thrift, defendant modified the Cameo Properties purchase agreement by extending the closing date. The purchase agreement required an additional $700,000 down payment[9] and the assumption of an existing contraction loan of $6,180,000. Later, defendant secretly increased the amount of this loan to $6,680,000.[10] That increase followed defendant's false explanation to the IIC board of directors on September 27, 1983, that USA Corporation would repay the loan and that $500,000 would be added to the balance on the Cameo Properties loan. Later, defendant assured an inquisi-

7. This same representation was subsequently made before the full board.

8. Defendant never had the stock assigned to IIC, and he permitted the stock to remain in Interlake Thrift's files.

9. Defendant arranged for Interlake Thrift to lend Isaksen and Rigby the funds for this down payment.

10. The purchase agreement required a $1.1 million down payment but it credited the purchasers with a $400,000 deposit. Defendant told Isaksen that this came from the original $375,000 deposit plus interest on that deposit. IIC's and Cameo's books reflect a tortuous series of entries to accomplish this modification as well as other changes from the agreement. First, defendant directed William Miller, one or two IIC venture comptrollers and who was in charge

of Cameo's books, to transfer $25,000 in interest from another account in order to increase the deposit to $400,000. Defendant then had Miller enter a $500,000 deposit even though the agreement called for only a $400,000 deposit. A series of other entries resulted in that $500,000 deposit being added to the existing $6,187,000 loan on the property. The result of those transactions was that, instead of crediting Isaksen and Rigby with any deposit other than the down payment, the $500,000 was added to the outstanding loan, so that according to IIC's and Cameo's books, Isaksen and Rigby now owed $6,687,000 on the Cameo purchase. In addition, because the deposit was increased, Miller had to increase the purchase price by $100,000 to reconcile that price with the addition to the deposit.

tive board member that the USA Corporation had repaid its loan.[11]

In June, 1983, defendant agreed to assist the joint venture between Peter Mathews and John Kabboord concerning a 125 unit condominium development project in Cocoa Beach, Florida. The site was owned by Banner Equities, an IIC subsidiary. Mathews was to provide architectural, engineering, and construction services. Kabboord was to arrange financing.

Defendant informed Mathews that he had secured $500,000 for each of the partners provided Mathews would sign certain documents. Yet, when Mathews refused to sign the agreements, defendant arranged for the loans from Interlake Thrift anyway. Defendant also drafted a construction loan commitment letter from IIC to Mathews and Kabboord. Defendant gave one copy of this letter to Mark Siegel, the IIC corporate secretary, for his signature. He gave an unsigned copy of the letter to the president of Interlake Thrift and informed him that the IIC loan commitment was for twelve million dollars, with advances up to eighteen million. Defendant also made false representations to Interlake Thrift's board to obtain the loan proceeds.

Ultimately, defendant obtained the loan from Interlake Thrift. However, because of Mathews' reluctance, he had to invent a new joint venture consisting of Kabboord's company and defendant's company, Crea-

tive Properties of Tampa, Inc. Later, defendant gave Interlake two checks totaling $605,000 as repayment of the construction loan. Those checks were drawn on an IIC account.[12]

On September 27, 1983, defendant informed the Freedom board of directors that he wanted to resign as president of IIC. On October 11, 1983, Freedom's board decided to install Jack Drawdy as president of IIC during its October board meeting. The board also determined that defendant's services were no longer required.

Defendant resigned the day that Drawdy was installed. Soon, Drawdy began to learn of problems associated with the Heritage, Ocean Sands, and Cameo Properties projects. He also learned that IIC owned Interlake Thrift.

Ultimately, IIC and Freedom paid Mathews for his work on the Ocean Sands project and Isaksen and Rigby for their lost profits on Cameo Properties. In addition, IIC paid Interlake the remaining $275,000 deficit outstanding on its original $880,000 Ocean Sands loan. Further, the Federal Home Loan Bank Board, which oversees savings and loan institutions, requested that Freedom "write down," or decrease the value, of several of IIC's real estate projects. Insofar as relevant to this case, FHLBB requested write-downs of $1.5 million on Interlake Thrift, $3.3 million on Cameo Properties, and $2.2 million on

---

**11.** To reflect repayment by USA Corporation, defendant had Interlake Thrift lend $1.5 million to U.S.A. Financial Corporation of Tampa, Inc. ("USA Financial") (defendant's own company). Defendant then endorsed that check, as president, over to IIC. When IIC received this check, however, the funds were credited to the account for Isakesen's and Rigby's two million dollar loan. Defendant designed a similar transaction from IIC's to make up the funds Interlake expended for the USA Financial. At defendant's instruction, William Miller transferred $1.5 million by wire to Interlake Thrift. Accordingly, Miller's resulting entries in IIC's books reflected that Interlake owed $1.5 million to IIC. However, because defendant led the president of Interlake Thrift to believe that USA Financial was a wholly owned IIC subsidiary, Interlake regarded that $1.5 million payment from IIC as a repayment of Interlake's late September loan to USA Financial. Therefore, after October 3,

Interlake Thrift's books showed nothing owing to it on the latter loan. Likewise, Interlake's books did not reflect that it owed IIC any money resulting from the October 3 wire transfer.

**12.** As with the transactions concerning Cameo Properties and the October 3 IIC "loan" to Interlake Thrift, defendant manipulated IIC's books to produce the $605,000 he furnished to Interlake. On October 17, he had a $500,000 check issued by an IIC subsidiary, Sunshine State Service Corporation, to Ocean Sands Joint Venture. Defendant directed IIC's accountant to enter in Sunshine's books that that payment was a "paydown on Interlake land advance." Similarly, defendant had Banner Equities issue a $105,000 check to Ocean Sands Joint Venture as a "refund of deposit." That check then was given to defendant.

Heritage. Thus, IIC's total losses for 1983 totaled over eight million dollars.[13]

At trial, defendant attempted to show that the loans were beneficial to the lending institutions. He also presented three witnesses to counter the testimony of William Miller. Finally, he strove to impeach parts of Miller's testimony.

## II

Defendant was convicted on charges pursuant to 18 U.S.C. § 657 and § 1006.[14] These statutes proscribe certain criminal conduct by a person "connected in any capacity with" an institution insured by the FSLIC. Defendant does not dispute that Freedom Savings and Loan Association falls within the latter category. Nevertheless, he maintains that he could not be convicted because he worked for IIC rather than Freedom.

The Eleventh Circuit has clearly indicated that the phrase "connected in any capacity" should be construed broadly to effectuate congressional intent by protecting federally insured lenders from fraud. *United States v. Payne*, 750 F.2d 844, 855 (11th Cir.1985). The court has also indicated that the corporate fiction of a wholly owned subsidiary will be "readily abandoned when used 'to defeat public convenience, justify wrong, protect fraud, or defend crime.'" *United States v. Cartwright*, 632 F.2d 1290, 1292 (5th Cir.1980).

The question of whether the president of a wholly owned subsidiary of an S & L is "connected in any capacity" is unresolved in the Eleventh Circuit. *Cartwright* did not deal with this issue (as the *Butler*[15] court correctly stated), and the government overstates *Cartwright* when it argues that any person who works for a subsidiary is automatically "connected with" the parent S & L. Instead of a *per se* rule, the court must examine the facts of each case. "In cases where the defendant is not directly employed by the insured bank, courts have focused on the relationship between the employing entity and the bank's business in deciding whether there is a sufficient 'connection' for purposes of the statute." *United States v. Fulton*, 640 F.2d 1104, 1106 (9th Cir.1981). *See also Butler*, 600 F.Supp. at 583; *United States v. Edick*, 432 F.2d 350 (4th Cir.1970).

## III

We find that the facts show a sufficient "connection." As IIC president defendant had the power to initiate loans by favorably recommending them to the board of directors. Moreover, the board relied on him for accurate recommendations on potential loans, because the directors did not have the time or capacity to investigate the accuracy of statements submitted in connection with loan applications. As such, defendant was an integral part of the loan-making process and hence, was "connected with" Freedom. *Cf. United States v. Gregory*, 730 F.2d 692 (11th Cir.1984), *cert.*

---

**13.** IIC eventually wrote down $7.7 million, although some of this was attributable to events not involved in this case. IIC did not "write down" any amount on Interlake Thrift.

**14.** In pertinent part, 18 U.S.C. § 657 provides that:

> Whoever, being an officer, agent or employee of or *connected in any capacity with* ... any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... willfully misapplies any monies, funds, credits, securities or other things of value belonging to such institution ... shall be fined not more than $5,000 or imprisoned not more than five years, or both ...

(Emphasis supplied.)
In pertinent part, 18 U.S.C. § 1006 provides that:

> Whoever, being an officer, agent or employee of or *connected in any capacity with* ... any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... with intent to defraud any such institution ... makes any false entry in any book report or statement of or to any such institution ... shall be fined not more than $10,000 or imprisoned not more than five years, or both....

(Emphasis supplied.)

**15.** *United States v. Butler*, 600 F.Supp. 580 (D.Ore.1984).

*denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). Moreover, Freedom and IIC were not entirely separate; with the exception of defendant, every member of the IIC board of directors was also a director of Freedom, and Freedom's president oversaw all the subsidiaries' activities. In fact, at the conclusion of every IIC board meeting, the directors began a Freedom board of directors' meeting.

For the reasons expressed in this opinion, WE AFFIRM.