**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Don C. DAVIS, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Daniel M. BURKE, Defendant–Appellant.**

**Nos. 89–8051, 89–8052, 90–8057, 90–8058.**

United States Court of Appeals,
Tenth Circuit.

Jan. 22, 1992.

Todd L. Vriesman (John A. Sbarbaro with him on the brief) of Kirkland & Ellis, Denver, Colo., for defendant-appellant Don C. Davis.

E. James Burke and Rhonda S. Woodard, of Burke, Woodard & Bishop, P.C., Cheyenne, Wyo., for defendant-appellant Daniel M. Burke.

Francis Leland Pico, Asst. U.S. Atty. (Richard A. Stacy, U.S. Atty., & David A. Kubichek with him on the brief), Cheyenne, Wyo., for plaintiff-appellee.

Before ANDERSON, BALDOCK and EBEL, Circuit Judges.

BALDOCK, Circuit Judge.

This case involves the theft of federally insured deposits through a series of complicated financial transactions involving collusion, deception, self-dealing and conflict of interest. Defendants Don C. Davis and Daniel M. Burke diverted or misapplied millions of dollars at the expense of several banks and savings and loan institutions, and ultimately the United States treasury.[1] The fraud required false representations to, and the concealing of important information from, bank examiners, bank directors and bank officers.

By superseding indictment, both defendants were charged with one count of conspiracy to commit offenses against and to defraud the United States (count 1), 18 U.S.C. § 371; nine counts of wire fraud (counts 2–10), 18 U.S.C. § 1343; five counts of misapplying federally insured funds (counts 11–14, 16), 18 U.S.C. § 657; three counts of making false entries in bank books and records or unlawful receipt of benefits (counts 15, 20 & 21), 18 U.S.C. § 1006. Davis also was charged in two counts of overvaluing security and making false statements (counts 18 & 19), 18 U.S.C. § 1014. After a ten-week trial in which the trial judge displayed consummate patience, the jury convicted Davis on fourteen counts including the conspiracy count (count 1), five counts of wire fraud (counts 3–6, 9), four counts of misapplying federally insured funds (counts 11–13, 16), two counts of aiding and abetting false entries (counts 15 & 21), one count of aiding and abetting in the unlawful receipt of benefits (count 20), and one count of overvaluing security (count 18). The jury convicted Burke on eleven counts, including the conspiracy count (count 1), three counts of wire fraud (counts 4–6), four counts of misapplying federally insured funds (counts 11, 12, 14 & 16) two counts of making false entries (count 15 & 21) and one count of unlawful-

ly receiving benefits (count 20). The district court, for these pre-Sentencing Guidelines offenses, sentenced Davis to six years imprisonment and Burke to four years. These appeals followed.

■ After submission of these appeals, we affirmed the imposition of civil monetary penalties against defendants based on violations of cease and desist orders of the Federal Reserve Board. *Burke v. Board of Governors*, 940 F.2d 1360 (10th Cir. 1991). Burke died on December 6, 1991. Thereafter, the government filed a suggestion of death. Burke's counsel, on behalf of the family, opposed dismissal, seeking an appellate decision on the merits. We respect the wishes of the family, but the law provides a more advantageous resolution: "death pending direct review of a criminal conviction abates not only the appeal but also all proceedings had in the prosecution from its inception." *See Durham v. United States*, 401 U.S. 481, 483, 91 S.Ct. 858, 860, 28 L.Ed.2d 200 (1971) (per curiam) (footnote omitted), *overruled on other grounds*, *Dove v. United States*, 423 U.S. 325, 96 S.Ct. 579, 46 L.Ed.2d 531 (1976) (per curiam) (eliminating *Durham* rule for petitions for certiorari, but not for appeals of right). *See also United States v. Williams*, 874 F.2d 968, 970 (5th Cir. 1989); *United States v. Schumann*, 861 F.2d 1234, 1236 (11th Cir.1988); *United States v. Mollica*, 849 F.2d 723, 725–26 (2d Cir.1988); *United States v. Littlefield*, 594 F.2d 682, 683 (8th Cir.1979); *United States v. Bechtel*, 547 F.2d 1379, 1380 (9th Cir. 1977). Accordingly, as to Burke, we shall dismiss his appeal and remand the criminal judgment against him to the district court with instructions to vacate the judgment and dismiss the underlying indictment. *See Id.*

I.

The government's case involved five transactions. We briefly outline these

---

1. Defendant John Edmiston was charged in a single count, pled guilty and testified against Davis and Burke. Edmiston was the president of First National Bank of Evanston (FNBE), owned an interest in the bank through the holding company, and served on the bank's board of directors.

transactions before reaching the merits of Davis's appeal.

## A. Acquisition of FNBE

The first transaction involved the acquisition of the First National Bank of Evanston, Wyoming (FNBE) by EVCO, Inc., a bank holding company, by a group of investors. Defendants Burke, Davis and Edmiston, *see supra* n. 1, first sought to acquire FNBE in 1982. All were well connected with other federally insured financial institutions. Davis was a major stockholder, board chairman and president of the Stockgrower's State Bank Company (SSBC), the bank holding company which owned Stockgrower's State Bank (SSB). Likewise, Edmiston was a stockholder and board member of SSBC. Burke was a board member of Guaranty Federal Bank (GFB).

Ultimately, the Federal Reserve Bank approved a $10 million acquisition of FNBE by a different investor group (the Burke group) with no more than a 3:1 debt-to-equity ratio ($7.5 million of debt) and no involvement of Davis and coinvestor Robert L. Anderson. Based on a series of false representations by Davis and Burke, however, the acquisition was financed for $12.5 million by Omaha National Bank, SSB, GFB and Provident Federal Bank. With the assistance of Burke, Davis directed the wire transfer of over $2 million for uses unrelated to the acquisition of FNBE. A total of $3.1 million of the acquisition funding was diverted to Davis and Anderson.

## B. GFB Purchase of Bank Holding Company Securities

GFB, and its wholly owned subsidiary Powder River Service Corp. (PRSC), purchased $1.5 million in subordinated debentures and $1 million in preferred stock issued by EVCO and another bank holding company, SSBC. Burke and Davis exercised control of GFB as part of a group which had majority stock ownership. While Burke served as a director, Davis frequently gave financial advice to the board and attended several GFB board meetings. Burke and Davis were instrumental in persuading GFB's president, Tom Hogan, to purchase these securities. *See* X Tr. 60. The proceeds were to enable EVCO and SSBC to activate Wyoming Financial Services (WFS), a recently formed corporation. In reality, WFS served as a conduit to funnel approximately $701,000 to Davis and $54,000 to Burke. *See* XII Tr. 100–11.

## C. Elkhorn Land Deal

In May 1984, a limited partnership, in which PRSC had an 84% interest, purchased land owned by the Elkhorn Land and Livestock Company. Burke and Davis persuaded the GFB Board to fund PRSC's participation in the amount of $1.65 million, with the understanding that the proceeds would be used to pay existing indebtedness on the land. Only $1.15 million was used for that purpose; Davis received the remaining $500,000 as a secret commission. Several months later, Burke and Davis had GFB's attorney prepare a "clarifying" minute entry indicating that the commission had been authorized by the GFB board when, in fact, it had not. *See* Pl. ex. 914; VIII R.S. 19. Although Burke abstained from the vote on the amendment, he and Davis took steps leading to its preparation. GFB executive vice-president Mike Brown approved the amendment only because he did not want to be fired. XXXII Tr. 31.[2]

## D. Dakota Minerals Deal

Burke and Davis agreed to purchase stock in Dakota Minerals, Inc. (Dakota) and initially secure a $1.75 million loan for Da-

---

**2.** Our resolution of these appeals has been delayed substantially because the transcript consists of over one-hundred volumes in an order which does not allow for ready reference or chronological review. For example, the testimony of various witnesses is contained out of order in supplemental volumes. We note that the pages of a transcript should be numbered in a single series of consecutive page numbers for each proceeding, regardless of the number of days involved. Given the magnitude of this trial, all pages should have been numbered consecutively for the entire multiple-volume transcript and we so direct for the future. *See* VI Administrative Office of the U.S. Courts, *Guide to Judiciary Policies and Procedures–Court Reporters' Manual* ch. XVIII, pt. k(2) (example set 2) (Oct. 91).

kota. Dakota would pay a future fee of $4 million and grant stock options to Burke and Davis for their assistance in securing additional financing. At a GFB board meeting in June 1984, Burke and Davis advocated a $1.75 million loan to Dakota and Burke voted in favor of it, all without mention of their personal interest in the loan. The agreement between Davis, Burke and Dakota, though partially performed, was never executed. Davis and Burke expressed apprehension about signing the agreement when bank examiners were examining GFB.

### E. GFB Loan to Tired Iron, Inc.

The final transaction concerned GFB's $650,000 loan to Tired Iron, a company owned by Davis. Davis agreed to provide an itemized list of collateral (aircraft parts, supplies and tools) with a value of $893,000 to secure the note. Pl. ex. 739, 747 & 751. Almost a year later, Davis provided the list which appraised the collateral at $1.45 million. Pl. ex. 752. The appraisal was done by Jay Johnson at the request and direction of Davis. Johnson had seen the parts one or two years previously, but did not inspect the inventory at the time he provided his estimate of a retail value of $1.45 million. The evidence tended to show that the parts were worth a maximum of $425,000 at retail and $170,000 at wholesale; a more realistic figure was $50,000 to $60,000, given a quick sale. Pl. ex. 754; XXXIII Tr. 42–110.

### II.

Defendant Davis first argues that his convictions under 18 U.S.C. § 657 and § 1006 are invalid because the trial evidence did not establish an essential element of those offenses, namely that Davis was an officer, agent or employee of a federally insured institution. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Under § 657, it is unlawful for a person who is "an officer, agent or employee of or connected in any capacity with" an insured institution to willfully misapply funds belonging to the institution. Likewise, under § 1006, it is unlawful for "an officer, agent or employee of or connected in any capacity with" an insured institution to make any false entry into its books, or, with intent to defraud the institution, to participate in or receive any money or other benefits through any transaction or act of the institution.[3]

Davis was not an officer or employee of GFB, and he argues that no evidence indicates that he acted as an agent of GFB. He points to cross-examination of Tom Hogan, president of GFB, and Art Volk, board chairman of GFB, wherein these witnesses responded that Davis was not an agent of GFB. Merely because Davis had not been designated as an agent of GFB does not preclude a trier of fact from determining that an agency relationship existed based upon conduct. As important, the government was required to prove only that Davis was a person "connected in any capacity with" an insured financial institution for purposes of §§ 657 and 1006.[4]

During the period alleged in the superseding indictment, Burke was a director of GFB and Davis often attended board meetings, providing financial advice to the

---

**3.** We note that the parallel statute, 18 U.S.C. § 1005 (pertaining to national banks), does not contain the class limitation contained in §§ 656, 657 and 1006. *See United States v. Edick,* 432 F.2d 350, 352 (4th Cir.1970).

**4.** Davis cites the district court's order granting bail pending appeal for the proposition that the district court "conceded that the factual predicate for liability under the statutes was lacking" when it indicated that Davis was neither an employee or officer or an agent of GFB. *See*

Davis's Brief at 26 (citing VI R. doc. 431 at 18). Not so. The district court determined that Davis acquired GFB stock for himself and for nominees and served as a financial consultant to GFB. From these operative facts and its prescient view of the broad construction we would afford §§ 657 and 1006, the district court reasoned that Davis was indeed "connected in any capacity with" an insured financial institution.

GFB board and its president. *See* XXXII Tr. 37; III S.R. 11; VIII S.R. 119, 122. Burke and Davis were able to acquire control of a majority of GFB shares and, hence, controlled the GFB board.[5] *See, e.g.,* XXIII Tr. 17. Although Davis argues that he was not a financial consultant to GFB, the testimony of Tom Hogan, the former president of GFB, certainly indicates otherwise. *See, e.g.,* VII R.S. 34; VIII R.S. 21, 62–64, 83–84, 119; IX R.S. 10, 66. A consulting contract or agreement was not required. One cannot read this transcript in its entirety and fail to develop a definite and firm conviction that Burke and Davis were tireless in their self-dealing when it came to influencing bank transactions.[6]

Davis contends, however, that only "officers, agents, or employees" who are "connected in any capacity with" an insured financial institution may be found liable under §§ 657 and 1006. According to Davis, "[t]he statutes apply only to officers, agents or employees, but allow those persons to be officers, agents or employees *of* [the institution] or, alternatively, officers, agents or employees connected in any capacity to [the institution]." Davis's Brief at 20. Davis further contends that § 657 requires the government to prove that a defendant had direct access to bank funds as an insider and used his position to victimize the bank.

Davis's construction of these statutes is too narrow. It would require us to strike out the following italicized words: *"Whoever,* being an officer, agent or employee *of or* connected in any capacity with...."* 18 U.S.C. §§ 657, 1006. While the class of persons coming within the statutes is limit-

ed by a relationship of trust, and in the case of § 657, direct or indirect access to bank assets, these statutes are not limited solely to bank officers, agents or employees. Moreover, if the trier of fact determines that a principal within the class has committed bank fraud, a person outside the class such as a bank customer may be held liable as an aider and abettor. *United States v. Cooper,* 464 F.2d 648, 649–50 (10th Cir.1972), *cert. denied,* 409 U.S. 1107, 93 S.Ct. 902, 34 L.Ed.2d 688 (1973); *United States v. Tornabene,* 222 F.2d 875, 877–78 (3rd Cir.1955).

We recently decided that the person "connected in any capacity with" language of § 657 should be given a "broad interpretation" in accordance with congressional intent of protection of federally insured institutions against fraud. In *United States v. Ratchford,* 942 F.2d 702 (10th Cir.1991), we held that a property manager who diverted funds from an apartment complex owned by two savings and loan associations was sufficiently connected to federally insured institutions to support conviction under § 657. *Id.* at 705.

> As president and owner of the managing company, defendant was aware of the savings and loans' ownership of the complex and that his ultimate responsibility was to these owners. It was in this position of trust that he diverted funds he knew belonged to these institutions to his own personal use.

*Id.* at 704. Although "each case is fact specific," *id.* at 705, several cases support the government's position that either (1) a stockholder who exerts control or (2) a financial adviser of a federally protected in-

---

**5.** Davis contends that he owned only 1.6% (4,600) of GFB shares. *See* Davis's Brief at 18 n. 15 & Reply Brief at 7. This conveniently ignores the GFB shares he purchased through nominees. Moreover, we look to Davis's effective control over the board given his alliance with Burke and other shareholders. When GFB was converted from a mutual company to a stock owned bank, Burke and Davis caused the number of directors on the GFB board to be reduced from twelve to five (one of whom was Burke), and made clear to remaining directors that it was their way or the highway.

**6.** Davis's implication that he was a mere customer of GFB (and therefore not liable under §§ 657 and 1007) is flatly contradicted by the record. Moreover, we note that a bank customer may be convicted as an aider and abettor under these statutes when the principal (an officer, agent, employee or other person connected in any capacity of trust with the institution) is found guilty of the offense. *See United States v. Giordano,* 489 F.2d 327, 330 (2d Cir.1973); *United States v. Tornabene,* 222 F.2d 875, 878 (3d Cir.1955). We note that the jury did indeed convict Davis of aiding and abetting Burke on some of the counts.

stitution may be within reach of these statutes. Both persons occupy "position[s] of trust." *See Id.* at 704.

In *United States v. Prater,* 805 F.2d 1441 (11th Cir.1986) (cited in *Ratchford*) the president of a real estate subsidiary wholly owned by an S & L was "connected with" the S & L under §§ 657 and 1006. *Id.* at 1446. The president of the real estate subsidiary had the power to initiate loans and the S & L board relied upon him for accurate recommendations concerning loans. *Id.* Those who serve a federally insured institution, whether in an employment context or in some other position of trust, are "connected with" that institution under §§ 657 and 1006. *See id.; United States v. Rice,* 645 F.2d 691, 693 (9th Cir.) (consultant retained by S & L to originate loans was "connected with" S & L under § 1006, notwithstanding he had no right to approve loans), *cert. denied,* 454 U.S. 862, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981); *United States v. Edick,* 432 F.2d 350, 352 (4th Cir.1970) (employee of bank service corporation was connected with bank under § 656; "[i]t was because of his intimate relation to the bank's business and its records, in a position of trust, that he was able to divert its funds and make false entries in its records"). A connection with a federally protected institution may result from control through stock ownership, or control through the power to extend credit. Such direct control, however, is not essential to a finding that a defendant is connected with the institution. *United States v. Payne,* 750 F.2d 844, 855 (11th Cir.1985).

*Garrett v. United States,* 396 F.2d 489 (5th Cir.), *cert. denied,* 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364 (1968), presented circumstances analogous to the present case. In *Garrett,* controlling stockholders of a bank were charged with misapplication of national bank funds in connection with the purchase of mortgages by the bank. *See* 18 U.S.C. § 656 (proscribing willful misapplication of national bank funds by "[w]ho[m]ever, being an officer, director, agent or employee of, or connected in any capacity with ... [the financial institution]"). The bank paid face value for the mortgages; the seller then paid a large

commission to a nonbank corporation owned by the defendants. The funds were deposited into a corporate bank account and immediately disbursed to the defendants by a series of checks. Defendants argued that because they were not officers, directors, agents or employees of the bank, they were not within the reach of the statute. The Fifth Circuit disagreed after examining the connection between the defendants and the bank. Defendants and their nominees obtained control of a majority of shares of the bank and arranged for the election of employees and associates to constitute a majority on the bank board. As controlling stockholders, defendants had a fiduciary duty not only to minority stockholders, but also to the bank. *Id.* at 491. Defendants participated in arranging the transactions resulting in their indictment. The court concluded that the "fact of ownership ... together with the activity ... in furtherance of control demonstrates a connection with the bank within the meaning of the statute." *Id.* at 491. The purpose of the statute is to protect and preserve bank assets. *Id.*

On this point, no significant difference exists between the statutes in this case and the bank statute in *Garrett.* As noted, Burke and Davis exercised control of GFB and were active in the affairs of GFB. Davis's assertion to the contrary is not in accord with the evidence when viewed in the light most favorable to the government. *See* Davis's Reply Brief at 5. Davis further contends that he lacked direct access to funds, but § 657 does not require the government to prove that Davis performed the ministerial task of disbursement.

### III.

Davis next argues that wire fraud counts 2–10, occurring in March and April, 1983, were time-barred because the superseding indictment was not returned until August 18, 1988, outside the five year limitation period. *See* 18 U.S.C. § 3282. Although the original indictment in this case was returned within the limitation pe-

riod (November 13, 1987), Davis contends that the superseding indictment impermissibly broadened or substantially amended these charges.

■■■■ The date of the original indictment tolls the limitations period as to charges alleged. *See United States v. Jones*, 816 F.2d 1483, 1487 (10th Cir.1987). A superseding indictment filed while the first indictment is validly pending is not barred by the statute of limitations unless it broadens or substantially amends the charges in the first indictment. *United States v. Schmick*, 904 F.2d 936, 940 (5th Cir.1990), *cert. denied,* —U.S. —, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991); *United States v. Grady*, 544 F.2d 598, 602 (2d Cir.1976). "[N]otice is the touchstone in deciding whether a superseding indictment substantially changes the original charges." *United States v. Gengo*, 808 F.2d 1, 3 (2d Cir.1986). If the allegations and charges contained in the superseding indictment are "substantially the same" as those contained in the original indictment, sufficient notice is presumed. *See Schmick*, 904 F.2d at 940.

■■■■ The two indictments allege identical wire transfers as part of a scheme to defraud. Davis claims that the superseding indictment changed the entire theory of criminal liability from a scheme to transfer $20 million for the benefit of the defendants to a scheme to obtain control of three financial institutions, FNBE, SSB and GFB. *See* Davis's Brief at 23; Reply Brief at 10–12. The wire fraud counts incorporate the conspiracy count which was modified in the superseding indictment. Davis notes that the conspiracy count of the superseding indictment did not include a previously named defendant and omitted various objects of the conspiracy (offenses under 18 U.S.C. §§ 1001 and 1005). Davis's Brief at 23. Davis also points out that additional objects of the conspiracy were added,

namely the commission of offenses under 18 U.S.C. §§ 1006 and 1014. An indictment is not amended impermissibly by a superseding indictment which names a greater or lesser number of defendants as coconspirators or contains a slightly different mix of closely related statutory violations as objects of the conspiracy, provided the essential nature of the conspiracy alleged in the first indictment remains the same. *See United States v. Sears, Roebuck & Co.*, 785 F.2d 777, 779 (9th Cir.), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986); *United States v. Panebianco*, 543 F.2d 447, 454 (2d Cir.1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977).

For purposes of the scheme or artifice to defraud incorporated into the wire fraud counts, we are satisfied that the conspiracy count in the original indictment covered not only Davis's control activities,[7] but also transactions including (1) the acquisition of FNBE with $12.5 million of debt, $3.1 million of which was diverted to Davis and Anderson,[8] (2) GFB's purchase of subordinated debentures and preferred stock from EVCO and SSBC, with certain proceeds diverted to Burke and Davis,[9] (3) the Elkhorn land deal and Davis's $500,000 commission appearing in the false GFB minutes,[10] (4) the Dakota Minerals transactions in which Davis and Burke had a secret interest,[11] and (5) the loan to Tired Iron, Inc. based on misvalued security.[12] Thus, Davis had prior notice of the conspiracy charged in the superseding indictment. Indeed, after a practical reading of the counts in question in each indictment, we must conclude "that essentially the same facts were used to charge almost identical offenses." *See United States v. Charnay*, 537 F.2d 341, 355 (9th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 528, 50 L.Ed.2d 610 (1976). The wire fraud counts remained the same, and the conspiracy charge (which

---

7. *See* I R. doc. 1 at 7, ¶ 1; 10, ¶ 10; 17, ¶ 18.

8. *See* I R. doc. 1 at 7–10, ¶¶ 3–7; 12–16, ¶¶ 1, 2, 4, 6–14.

9. *See* I R. doc. 1 at 10–11, ¶¶ 10 & 12; 18–21, ¶¶ 21–34.

10. *See* I R. doc. 1 at 11, ¶ 11; 21–22, ¶¶ 35–36.

11. *See* I R. doc. 1 at 11–12, ¶ 13; 26, ¶¶ 48–49.

12. *See* I R. doc. 1 at 24, ¶ 43.

contained a description of the fraudulent scheme alleged in the wire fraud counts) was not materially different. *See Grady,* 544 F.2d at 602. Therefore, we must reject Davis's contention that counts 2–10 were time-barred.

### III.

■■■■■ Defendant contends that the district court erred in not submitting his "theory of the defense" instructions and instructing the jury that if the money invested by GFB in the subordinated debentures and preferred stock was used by the recipient corporations in the way promised to GFB, there could be no misapplication.[13] A defendant is entitled to correct instructions on defenses supported by sufficient evidence for a jury to find in defendant's favor. *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988); *Ratchford,* 942 F.2d at 707. Still, a district judge has substantial discretion in formulating the instructions; our review is confined to determining whether the instructions as a whole sufficiently cover the issues presented by the evidence and constitute correct statements of the law. *United States v. Pena,* 930 F.2d 1486, 1492 (10th Cir.1991). Instructions are considered as a whole; a particular jury instruction is not be read in isolation. *See Cupy v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

Davis's "theory of the case" instructions are essentially summaries of the evidence in the light most favorable to the defense,[14] summaries more appropriate for closing argument. The trial judge's decision not to give such instructions was proper in every respect. *See United States v. Barham,* 595 F.2d 231, 245 (5th Cir.1979) ("theory of

the defense" instruction properly refused when it "was essentially a recounting of the facts as seen through the rose-colored glasses of the defense—glasses [defendant] hoped the jury would wear when they retired to the jury room"). These summaries marshal facts supporting Davis's version of the events, and would preclude the jury from finding the elements of various charged offenses. After review of the court's instructions to the jury, we note that they adequately (and with commendable clarity) cover the essential elements of every offense charged and encompass Davis's defenses supported by the evidence such as reliance on expert advice, good faith, and approval by bank officials after adequate disclosure. *See, e.g.,* IV R. doc. 332, instr. 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32, 34, 36, 52 & 53.

■■■ The other challenge concerns the district court's rejection of Davis's instruction concerning misapplication. Davis relies upon *United States v. Payne,* 750 F.2d 844 (11th Cir.1985), in which the court of appeals set aside misapplication convictions because the government failed to prove that the borrowers for whom the defendants arranged loans were not creditworthy, nor did the government prove the loans undersecured. *Id.* at 750 F.2d at 856–57. *Payne* does not support Davis's argument.

■■■■ Misapplication of bank funds under § 657 involves: "(1) the willful (2) misapplication (3) of money, funds or credits (4) of a federally protected bank." *United States v. Harenberg,* 732 F.2d 1507, 1511 (10th Cir.1984) (construing 18 U.S.C. § 656);[15] *United States v. Twiford,*

---

**13.** The proposed instruction stated:
 No misapplication of bank funds results where the recipient of bank funds uses them for the very purpose for which the funds were disbursed.
 IV R. doc. 314.

**14.** *See, e.g.,* Defendant Davis's Instruction No. [unnumbered]
  . . . .
  COUNT 1: Mr. Davis did not enter into an agreement with Dan Burke, John Edmiston or anyone else to commit criminal acts. While

the government claims that he conspired to control three banks, the evidence clearly showed that Mr. Davis was attempting to sell his interest as required by government regulators. Davis's attempts to comply are being unfairly and improperly used against him.
  . . . .
 IV R. doc. 314.

**15.** Section 656 is a parallel statute to § 657, whereas § 656 protects institutions insured by FDIC, § 657 protects institutions insured by

600 F.2d 1339, 1343 (10th Cir.1979) (same). Misapplication may occur when an officer, director, employee or other person subject to the statute knowingly lends money to a sham borrower or causes all or part of the loan to be made for his own benefit while concealing his interest from the bank. *Twiford,* 600 F.2d at 1341–42. Misapplication of funds " 'occurs when funds are distributed under a record which misrepresents the true state of the record with the intent that bank officials, bank examiners, or the Federal Deposit Insurance Corporation will be deceived.' " *Id.* at 1341 (quoting *United States v. Kennedy,* 564 F.2d 1329, 1339 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978)). Thus, when a person within the ambit of § 657 receives material benefits of loans without disclosing this fact, misapplication has occurred. *See United States v. Cooper,* 464 F.2d 648, 651–52 (10th Cir. 1972) (construing 18 U.S.C. § 656).

The proffered instruction would have narrowed the test, instructing the jury that if a recipient of bank funds uses them for the purpose intended, misapplication cannot occur. This is an incorrect statement of the law. A borrower of funds may use them for the purpose intended, yet the bank insider (who may or may not be aided and abetted by the borrower) may not disclose other material facts surrounding the extension of credit, such as adverse borrower characteristics, inadequate collateral or self-dealing, and, therefore, commit misapplication of funds. *See Payne,* 750 F.2d at 856; *United States v. Riebold,* 557 F.2d 697, 700–01 (10th Cir.), *cert. denied,* 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977). Indeed, we have recognized that misapplication may occur when the funds are applied by the borrower for the very purpose intended, yet the bank insider has failed to disclose his interest in the transaction. *See Twiford,* 600 F.2d at 1340–41.

In *Twiford,* a bank officer and director made a $20,000 loan to a construction company president for operating expenses. The bank officer also indicated to the borrower that the officer knew someone that would cosign a construction bond for a $6,500 fee. A loan for $26,500 loan was made, and the proceeds applied to the borrower's satisfaction. The cosigning fee was paid to a fictitious party and "the jury concluded that through a series of transactions the sum had been channeled to defendant [bank officer]." *Id.* at 1341. Such lack of disclosure constituted misapplication.

■ The theory underlying defendant Davis's proffered instruction is "that the money invested by GFB in subordinated debentures and preferred stock was used by the recipient corporations [SSBC and EVCO] in exactly the fashion promised to GFB [to invest in WFS] and, thus, there could be no misapplication." Davis's Brief at 26. The proffered instruction would have made irrelevant Davis's undisclosed self-dealing when it came to GFB's investment in the securities in question and thus was improper. Moreover, the trier of fact is not restricted solely to the immediate transferee of bank funds when determining whether misapplication has occurred. *See Harenberg,* 732 F.2d at 1511.

### IV.

Davis argues that the district court should have granted a new trial because various counts of the indictment were faulty. Presumably, Davis seeks a new trial absent the evidence used to prove the allegedly faulty counts.

### A.

■ Davis contends that counts 11, 12 and 13 of the superseding indictment should have been dismissed. These counts charged Davis with willful misapplication of bank funds with respect to GFB's purchase of subordinated debentures in EVCO and SSBC, and PRSC's (a wholly-owned subsidiary of GFB) purchase of preferred stock in SSBC. The substance of Davis's argument is that Davis could not misapply funds "belonging to or intrusted in the care of" GFB. He points out that GFB invested the funds in bank holding companies (SSBC

FSLIC. *United States v. White,* 882 F.2d 250, 253 (7th Cir.1989).

and EVCO), and the bank holding companies then spent only a portion of the funds to acquire an option in WFS. WFS then paid substantial sums to Burke and Davis.

Davis contends that these counts must be dismissed for three reasons: (1) he was not within the class to which 18 U.S.C. § 657 applies, (2) the grand jury did not indict him for misapplication of funds belonging to WFS, but rather belonging to GFB, and (3) as a matter or law, funds belonging to WFS cannot belong to GFB and cannot be the subject of misapplication counts 11–13.

We have rejected the first reason as discussed above. The second reason concerning the sufficiency of the indictment is without merit. Counts 11–13 incorporate by reference allegations in the conspiracy count indicating that the money was diverted to personal use through WFS; thus, the grand jury indicted on this theory. *See* II R. doc. 146 at 8, ¶¶ 13 & 15.

▮▮▮▮ The third reason, that GFB funds were not involved, is foreclosed by any number of authorities, including *United States v. Harenberg*, in which Judge Barrett, writing for the court, eloquently and firmly rejected such a grudging interpretation of § 656. First, GFB's decision to purchase these securities in amounts which exceeded the legitimate uses of these funds constituted misapplication of GFB's bank funds.[16] *Harenberg*, 732 F.2d at 1511; *United States v. Farrell*, 609 F.2d 816, 819 (5th Cir.1980). "The statute does

not require that cash actually leave the bank before a violation occurs." *Farrell*, 609 F.2d at 819. Davis's concealed interest in these funds "did not suddenly materialize *after* the bank funds were disbursed to the borrowers; rather it existed well before." *See Harenberg*, 732 F.2d at 1511. Second, recognizing the infinite imagination for evil, *see Genesis* 6:5, including methods for misapplication of bank funds by those familiar, *see Payne*, 750 F.2d at 856, we have declined to apply the statute solely on "the flow of funds and the consequent changes in the incidence of ownership." *Harenberg*, 732 F.2d at 1511. Rather, we look at the substance of the transactions, even if multiple entities are involved. *Twiford*, 600 F.2d at 1341. It seems to us that Davis's invitation to apply the statute based solely on the exchange of property rights (e.g. subordinated debentures and preferred shares exchanged for cash), without regard to the concealed information and the substance of the transactions, is exactly the approach rejected in *Harenberg*, one which would "miss the forest for the trees." *See Harenberg*, 732 F.2d at 1511. Davis's attempt to distinguish *Harenberg* and *Twiford* as involving kickbacks to bank officers and directors is unavailing in light of our previous rejection of such a limited approach.

### B.

▮▮▮ Davis next argues that the district court should have dismissed count 18 which

---

**16.** See VIII R.S. 31 which illustrates the wisdom of this construction:

Mr. Pico: Mr. Hogan, had you known that Mr. Davis was going to obtain a substantial portion of the monies from the subordinated debentures and preferred shares, would you have invested those in behalf of Guaranty Federal Bank?

Mr. Hogan: No.

It matters not that Mr. Hogan viewed the investments as prudent at the time made; such view was based in part on material misinformation. Davis further argues that to the extent that the allegedly misapplied funds came from PRSC, a wholly-owned subsidiary of GFB, such funds are beyond the reach of § 657 because PRSC was not a federally insured institution. Davis relies upon *United States v. White*, 882 F.2d 250 (7th Cir.1989), which involved allegedly false statements made to a wholly-owned equipment

leasing subsidiary of a federally protected bank under 18 U.S.C. § 1014. We view *White* as turning on a failure of proof; the government did not prove that the defendant knew that the false statements made to the subsidiary would affect the parent bank. *See Id.* at·254.

The evidence indicates that PRSC never received the funds provided by GFB, rather, those funds were disbursed from GFB to SSBC and EVCO. Moreover, even had the funds passed from GFB through PRSC, ample proof indicates that the funds belonged to GFB or that PRSC was merely a conduit through which Burke and Davis exploited GFB. *See id.* at 253; *Prater*, 805 F.2d at 1446; *United States v. Fulton*, 640 F.2d 1104, 1105–06 (9th Cir.1981); *United States v. Cartwright*, 632 F.2d 1290, 1292–93 (5th Cir.1980); *Sell v. United States*, 336 F.2d 467, 472 (10th Cir.1964).

charged him with overvaluing security by submitting a false appraisal report. Davis argues that because the appraisal report was not received by GFB until almost one year after the loan was made and after the note matured,[17] the appraisal report as a matter of law could not be for the purpose of influencing GFB to approve a loan to Tired Iron, Inc., as alleged in the indictment. He also claims that the airplane parts appraised were not collateral for the loan and that he did not in any way submit the appraisal to GFB.

Viewed in the light most favorable to the government, sufficient evidence supports the charge that Davis was responsible for submitting the appraisal report to GFB and that the report valued the collateral for the $650,000 loan in question. GFB sought the appraisal as a condition of the initiation and continuation of the loan. Pl. ex. 747, 1260. Johnson, who prepared the appraisal, did so at the behest of Davis. XXXIII Tr. 29. Mike Brown, the executive vice-president of GFB, testified that the appraisal was part of GFB's records pertaining to Tired Iron, Inc., as a borrower. XIV R.S. 45. The jury could logically infer that Davis provided the late appraisal report incident to GFB's extension of credit. Having so determined, it is of no moment that the inflated appraisal report was furnished subsequent to the loan advance. *United States v. Kindig,* 854 F.2d 703, 706 (5th Cir.1988); *United States v. Gardner,* 681 F.2d 733 (11th Cir.1982); *United States v. Baity,* 489 F.2d 256, 257 (5th Cir.1983). The government was not required to prove that GFB actually relied upon the appraisal. *See United States v. Goberman,* 458 F.2d 226, 229 (3rd Cir.1972).

### C.

▇ Davis contends that count 21 should have been dismissed because it alleges that on or about September 28, 1984, Davis and Burke made and caused to be made false entries in GFB minutes of October 3, 1984. According to Davis, "[i]t is factually and legally impossible for defendant Davis or any person to cause the falsification of a future wholly independent event." Davis's Brief at 34.

Under 18 U.S.C. § 1006, the government was required to prove that "(1) defendant made a false entry in bank records, caused it to be made, or aided and abetted its entry; (2) defendant knew the entry was false when it was made; and (3) defendant intended that the entry injure or deceive a bank or public official." *United States v. Wolf,* 820 F.2d 1499, 1504 (9th Cir.1987), *cert. denied,* 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988) (construing 18 U.S.C. § 1005); *United States v. Jackson,* 621 F.2d 216, 219 (5th Cir.1980) (same). Although Davis contends that the events of September 28 and October 3 are wholly independent, such is not the case. To the contrary, Burke and Davis met with Ron Brown, attorney for GFB, on September 28, 1984, after inquiries by federal regulators, including inquiries about the Elkhorn land deal. XXX Tr. 37–41, 69, 140, 145, 155–56; 184–88; Pl. ex. 1170. The meeting was designed to respond to those inquiries, and therefrom would come the false minutes of October 3, 1984. Burke sat on the board which approved the minutes, although he abstained on the vote concerning the fraudulent amendment. The false entry in the October 3 minutes had its genesis in the September 28 meeting; a reasonable jury could conclude beyond a reasonable doubt that Davis knowingly aided and abetted Burke in creating a false bank record, all in an effort to satisfy federal regulators concerning the previously unmentioned $500,000 Elkhorn commission paid to Davis. It is sufficient that Davis knowingly "set into motion" or knowingly participated in events which would necessarily cause the false entries to be made. *See Wolf,* 820 F.2d at 1504; *United States v. Krepps,* 605 F.2d 101, 109 n. 28 (3rd Cir.1979).

### V.

▇ Davis next argues that the indictment should be dismissed or evidence suppressed because of government agency deception. Specifically, Davis contends

---

**17.** The note may have matured, but it was not paid. XIV R.S. 35.

that the Federal Reserve Board (FRB), the Federal Home Loan Bank Board (FHLBB) and the Office of Comptroller of Currency (OCC) violated the Right to Financial Privacy Act (RFPA), 12 U.S.C. §§ 3401–3422, when, beginning in August 1984, these agencies (along with the Wyoming State Examiner's Office) exchanged information and transferred financial records pertaining to Davis's bank transactions. Davis's Brief at 35–36. In response to a similar argument by Davis in a civil enforcement proceeding, we held that RFPA was not violated by the FRB requested information from the above supervisory agencies in pursuit of its supervisory responsibilities. *Burke,* 940 F.2d at 1368. We are satisfied that the above agencies acted within their supervisory capacities [18] in securing and exchanging information concerning Davis's activities with respect to bank holding companies and individual banks.[19] *See* 12 U.S.C. §§ 3401(7), 3412(d), & 3413(b). Therefore, we must conclude that RFPA did not apply to the information disclosed by these agencies concerning Davis's bank transactions. *See Burke,* 940 F.2d at 1368; *Adams v. Board of Governors,* 855 F.2d 1336, 1345 (8th Cir.1988). Moreover, even had the RFPA been violated, we agree with the district court that suppression is not an available remedy, nor is dismissal of an indictment. *See* LVI Tr. 81; 12 U.S.C. § 3417(d); *United States v. Miller,* 425 U.S. 435, 442–43, 96 S.Ct. 1619, 1624, 48 L.Ed.2d 71 (1976); *United States v. Kingston,* 801 F.2d 733, 737 (5th Cir.1986), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 495 (1987); *United States v. Frazin,* 780 F.2d 1461, 1464–66 (9th Cir.), *cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986).

■ Davis next contends that the FRB induced him participate in a meeting on June 7, 1985, to discuss financial problems of SSBC and EVCO, without revealing to him that, two days earlier, the FRB had sent a criminal referral to the United States Attorney. The criminal referral identified "eight or nine insiders" of SSBC and EVCO as the targets. The referral was drafted not later than May 2, 1985, but was not received by the U.S. Attorney until June 10, 1985. Def. ex. 2038, 2039. Davis seeks suppression of statements made during the meeting or dismissal of the indictment.

The district court denied a suppression motion concerning statements from an earlier FRB meeting in which Davis participated, along with other bank officers. XLI Tr. 93, 105–08. The district court determined that no custodial interrogation was involved. The June 7, 1985, meeting also involved the boards of directors from EVCO and SSBC and various Federal Reserve System personnel. Ron Brown was present and was representing Davis, as well as other directors. The purpose of the June 7, 1985, meeting was to present cease and desist orders to EVCO, SSBC and various individuals. XLI Tr. 133. The Federal Reserve System attorney, who had worked on the criminal referral, indicated that written plans submitted by the boards in response to the consent orders would be accepted if reasonable, and that "the Fed was trying to obtain remedial rather than punitive actions." Pl. ex. 809 at 1; XLI Tr. 159, 161–62.

Also discussed were various supervisory issues, raised at the earlier meeting, which are material to the criminal prosecution. For example, Davis was asked the whereabouts of $475,000 supplied by the holding companies to WFS. XLI Tr. 134. He referred his questioner to the books of WFS. *Id.* Likewise, in response to questions, Davis stated that he was not a shareholder, officer or director of WFS, but did receive consulting fees. *Id.* He also indicated that he had attended EVCO board meetings. Pl. ex. 809 at 3. Despite the potential overlap between the civil and criminal cases, Maryann Hunter of the Federal Reserve testified that "we were trying to correct the problems on the supervisory issues that we had through our civil type actions in a remedial type of way." XLI Tr. 161.

---

**18.** SSBC and EVCO were regulated by the FRB; FNBE by the OCC; SSB by the FDIC and the Wyoming State Examiner's Office; and GFB by the FHLBB.

**19.** We note that an additional exception to RTPA now in effect, 12 U.S.C. § 3413(*l*), would encompass the disclosures in this case.

There is no proof of custodial interrogation at the June 7, 1985, meeting. Accordingly, the safeguards of the Fifth Amendment, as interpreted in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were unnecessary. *See Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (*Miranda* warnings not required during noncustodial interview pursuant to criminal tax investigation). Moreover, in denying the closely related suppression motion concerning statements made at the earlier meeting, the district court implicitly rejected the idea that the June 7, 1985, meeting was part of "a pattern of trickery on behalf of the government," XLI Tr. 103, in which the government was using the administrative process to obtain criminal information. *See* XLI Tr. 108. This implicit finding is not clearly erroneous.

█ A government agency charged with bank oversight may well develop information in civil matters which may be relevant in a potential criminal prosecution. *United States v. Copple*, 827 F.2d 1182, 1189 (8th Cir.1987), *cert. denied*, 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988). Although the agency did not tell the parties concerning the referral, Davis has not come forward with evidence on his due process claim indicative of either (1) reasonable reliance on this deliberate omission, or (2) prejudice resulting from such reliance. *See United States v. Caceres*, 440 U.S. 741, 752–53, 99 S.Ct. 1465, 1472, 59 L.Ed.2d 733 (1979); *Cox v. Louisiana*, 379 U.S. 559, 573, 85 S.Ct. 476, 485, 13 L.Ed.2d 487 (1965). Accordingly, we reject it just as the district court apparently did.

## VI.

█ Davis next argues that he should have received a new trial based

upon prosecutorial misconduct, specifically a sentencing memorandum filed by the government. *See* V R. Doc. 355. Although we see many a thin argument at the court of appeals, we are hard pressed to determine how the sentencing memorandum (postverdict) would require a new trial, even if it did net the government some press coverage. *See* V R. doc. 357, ex. A. In any event, we reject the notion that Fed.R.Crim.P. 32(a)(1), which provides that "[t]he attorney for the government shall have an equivalent opportunity to speak to the court," precludes the filing of a written sentencing memorandum.[20] For instances of such memoranda being filed by the government, see *United States v. Ruminer*, 786 F.2d 381, 385–86 (1986) and *United States v. Salas*, 824 F.2d 751, 752–53 (9th Cir.), *cert. denied*, 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987). Only if the government's sentencing memorandum is incorporated expressly into the presentence report and the defendant objects to material contained in the memorandum, would compliance with Fed.R.Crim.P. 32(c)(3)(D) (objections to the presentence report) be necessary. *Salas*, 824 F.2d at 753.

## VII.

█ Defense counsel requests a writ of mandamus requiring the district court to process his interim vouchers for payment of fees and expenses pursuant 18 U.S.C. § 3006A.[21] Counsel was appointed over his objection on March 23, 1988, and represents that he has yet to receive any interim payments, despite compliance with the district court's order on the subject, which was approved by the Chief Judge of the Tenth Circuit. *See* VII Administrative Office of the United States Courts, *Guide to Judiciary Policies & Procedures* app. E

---

**20.** No common law right of allocution existed for the government. *See* 3 Charles A. Wright, *Federal Practice & Procedure–Criminal* § 525 at 87 (1982). The provision in Rule 32 was added in 1975 and requires that the government attorney be heard, if he so chooses. *Id.*

**21.** Fee determinations by the district judge pursuant to the Criminal Justice Act are administrative in character and do not constitute final appealable orders within the meaning of 28 U.S.C. § 1291. *United States v. Rodriguez,* 833

F.2d 1536, 1537–38 (11th Cir.1987); *United States v. Walton (In re Baker)*, 693 F.2d 925, 926–27 (9th Cir.1982); *United States v. Smith*, 633 F.2d 739, 741–42 (7th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981). 18 U.S.C. § 3006A(d)(4) requires that the district court "shall fix the compensation and reimbursement to be paid to the attorney" given a properly supported claim. The district court's order indicates that the district judge "will review the interim vouchers when submitted ... and will authorize compensation to

(interim payments to counsel). In seeking mandamus, however, we note that counsel has not complied with Fed.R.App. 21(a) concerning the requirement of filing a separate petition and proof of service on the respondent judge, as well as other parties below. We therefore deny the request, but without prejudice to a properly filed and served petition.[22]

Defendant Burke's appeal is DISMISSED. The criminal judgment against defendant Burke is REMANDED to the district court with instructions to VACATE it and DISMISS the underlying indictment against him. The criminal judgment against defendant Davis is AFFIRMED. The request of Davis's counsel for the writ of mandamus to issue is DENIED without prejudice to a proper application. All pending motions are DENIED.

be paid" and "payment [of] all reimbursable expenses." I R. doc. 101 at 2. The district judge will also review the final voucher and submit to the chief circuit judge for review and approval. *Id.*

Here, counsel claims that the district court has not complied with its duty to review CJA vouchers and forward them for payment. We view this as fundamentally different from claims concerning the *amount* of payment and, therefore, conclude that the matter is cognizable under 28 U.S.C. § 1651(a).

**22.** Defense counsel also suggests that a new trial may be warranted if the failure to pay "resulted in an abrogation of Mr. Davis's rights." Davis's Brief at 45. After painstaking review of the proceedings below and in this court, we confidently state that no such abrogation has occurred. A new trial on this ground is not warranted.