UNITED STATES of America, Appellee,

v.

Del Ray Keith CHANDLER, Appellant.

No. 94–2019.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1995.

Decided Sept. 28, 1995.

Samuel A. Perroni, Little Rock, Arkansas, argued (Mona J. McNutt, on the brief), for appellant.

Robert L. Roddey, Assistant U.S. Attorney, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HANSEN, Circuit Judge, and DAVIS,* District Judge.

DAVIS, District Judge.

Del Ray Keith Chandler appeals from his convictions [1] for misapplication of bank funds, 18 U.S.C. § 657, offering a gratuity, 18 U.S.C. § 215(a)(1), and accepting a gratuity, 18 U.S.C. § 215(a)(2). We affirm.

In October 1985, Chandler, along with David Siegel and Warren Halperin (the "purchasers"), each acquired a one-third interest in 93 percent of the stock of West Helena Savings and Loan ("WHS & L"). Each purchaser was to obtain a loan in the amount of $235,000 from the First American Bank of Los Angeles ("First American") to finance

---

* The HONORABLE MICHAEL J. DAVIS, United States District Judge for the District of Minnesota, sitting by designation.

1. The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas, Western Division.

the purchase of the WHS & L stock. On the day the First American loans were to be closed, however, First American informed Chandler that it would only lend a total of $300,000 towards the purchase of the WHS & L stock. Chandler then made other arrangements to obtain the additional $400,000 needed for the purchase, including a short term loan in the amount of $100,000 from Joseph Abandonatto; a loan which happened to be funded through First American.

Thereafter, Chandler was elected Chairman of the Board of WHS & L, David Siegel was elected Vice–Chairman and Warren Halperin became a member of the Board. Prior to the purchase of the WHS & L stock by the purchasers, Chandler was the President and David Siegel was Chairman of the Board of Tri–State Financial Services, Inc., a California corporation which was a wholly owned subsidiary of WHS & L. A new entity, Tri–State Financial Services of Arkansas, Inc., was created in December 1985 by WHS & L, to which all of WHS & L's interest in Tri–State Financial Services, Inc. of California was transferred (hereinafter referred to as "Tri–State").

In December 1985, Chandler asked Mr. Joseph Anthony to borrow $110,000 from Tri–State and to thereafter loan Chandler a like amount. Anthony, a friend and business associate of Chandler's, did as Chandler asked. The funds for the loan came from WHS & L, and WHS & L carried the loan on its books as a consumer loan.

In May 1986, Anthony was involved in a leasing transaction between the First Alliance Corporation and WHS & L. He was to receive $10,000 as his commission for his part in brokering the transaction. When he was paid by First Alliance, however, the check was in the amount of $110,000. Anthony contacted First Alliance and Chandler regarding the error in the commission check. Chandler advised him to send the additional $100,000 to WHS & L as payment on the loan he obtained from Tri–State in December 1985.

In the spring of 1986, Chandler and Siegel began to search for long-term financing to retire the short-term financing they obtained for the purchase of WHS & L. In connection with this endeavor, Chandler and Siegel contacted the Southern Bankers Mortgage Corporation in Houston, Texas ("Southern Bankers"). Southern Bankers was a wholly owned subsidiary of Liberty Federal Savings of Raton, New Mexico. Mike Furman owned a controlling interest in Liberty.

In July 1986, Chandler and Siegel arranged to meet with Furman and Bill Straughn of Southern Bankers in Houston. Chandler and Siegel wished to obtain three loans from Southern Bankers, each in the amount of $235,000, to themselves and to Warren Halperin. Siegel arrived at the meeting first, at which time Furman told Siegel that Furman also needed a loan to pay off his financing for his stock purchase in Liberty, in the amount of $821,000. Furman indicated a willingness to use as collateral for the loan his stock in Liberty, as well as some real property located in Midland, Texas.

When Chandler arrived at the meeting, he and Siegel met privately to discuss Furman's loan request. They decided to approve Furman's request because it appeared to be a good loan and because they believed that the approval of their request for a loan from Southern Bankers hinged on their approval of Furman's loan.

Furman offered to increase the loan from Southern Bankers to a total of $821,000, which offer was accepted by Chandler and Siegel. The terms of the Tri–State loan to Furman and the Southern Bankers' loans to the purchasers were identical, except that Southern Bankers disbursed only $705,000, the remaining $116,000 was provided in the form of a letter of credit upon which Chandler and Siegel drew in late 1986. As collateral for the Southern Bankers' loan, the purchasers pledged their WHS & L stock, along with certain real property located in New Jersey and California.

To fund the Furman loan, Chandler directed that $800,000 be wired from WHS & L to Tri–State's account in California. A journal voucher entry was also prepared indicating that the purpose of the wire was to loan Tri–State monies to fund a real estate loan in Houston. The loan proceeds from Southern

Bankers were wired to Houston from Liberty Federal in New Mexico.

Chandler was charged in a 15 count indictment returned by the grand jury on March 17, 1992 in the Eastern District of Arkansas. Subsequently, a Superseding Indictment was returned containing 15 counts. Prior to trial, the district court dismissed Count I [2], over the objections of the government, and Counts IV, V, VII and XII–XV with the consent of the government. On April 10, 1992, Chandler was acquitted of Counts II and III of the Superseding Indictment and convicted of Counts VI and VIII through X.[3] Chandler then moved the district court for entry of a judgment of acquittal on all of the counts upon which he had been found guilty by the jury.

The district court granted Chandler's motion as to Count VIII, but denied it as to Counts VI, IX and X. On April 14, the district court sentenced Chandler to 18 months imprisonment on Counts VI and IX, to be served concurrently, and placed him on probation for three years on Count X. Chandler began serving his sentence on October 3, 1994.

■ Chandler first contends that the district court erred by not dismissing Count VI of the Superseding Indictment because the Anthony loan was made by a California service corporation, Tri–State, to a California resident, Joe Anthony, who subsequently transferred the funds to Chandler, a California resident. Because these transactions occurred between California residents, Chandler contends the district court lacked jurisdiction and venue.

Chandler's contentions concerning jurisdiction were soundly and persuasively rejected in *United States v. Cartwright*, 632 F.2d 1290, 1292 (5th Cir.1980). There the defendant was convicted of fourteen counts of bank fraud under four different statutes. On appeal, he contended that although his fraud-

ulent activity involved a subsidiary of a federally insured savings and loan institution, the subsidiary itself was not federally insured. Thus, the federal statutes did not apply. The court rejected defendant's argument:

> Under 18 U.S.C. § 657, it is a criminal offense for an officer of a federally insured lending institution to misapply funds 'belonging to' that institution. It is perhaps true that under principles of corporations law the assets of a wholly owned subsidiary do not 'belong' to the sole shareholder in a legal sense. That, however, is merely a byproduct of the corporate fiction readily abandoned when used 'to defeat public convenience, justify wrong, protect fraud, or defend crime.' ... [I]t is difficult to assail the argument that depleting the assets of a wholly-owned subsidiary reduces the value of the subsidiary's stock and thus directly diminishes the assets of the parent. We therefore conclude that the funds of a wholly-owned subsidiary 'belong to' the parent within the meaning of 18 U.S.C. § 657.

632 F.2d at 1292.

In the instant case, Tri–State of California was, in fact, a wholly-owned subsidiary of WHS & L, albeit a second-tier subsidiary. It cannot be disputed that the funds of WHS & L were federally insured. Nor can it be contested that WHS & L was located in the Eastern District of Arkansas. Moreover, and more importantly, the officers and directors of WHS & L considered the Anthony loan to be a loan from WHS & L and so recorded it, as a consumer loan, on their books. Given those salient facts, Chandler's protestations of corporate separateness must fail. The evidence adduced at trial indicated that Chandler utilized Tri–State of California as a funnel for funds which originated at WHS & L. Upon the reasoning set out in *Cartwright*, we find that the district court

---

**2.** Count I of the Superseding Indictment alleged, inter alia, a conspiracy to misapply bank funds in violation of Section 657.

**3.** Count VI alleged that Chandler had misapplied the funds of WHS & L in relation to the Anthony loan; Count VIII alleged Chandler had misap-

plied the funds of WHS & L in relation to the Furman loan for financial gain; Count IX alleged that Chandler offered a gratuity in relation to the Furman loan; and Count X alleged that Chandler had accepted a gratuity in relation to the Furman loan.

properly exercised jurisdiction over Count VI of the Superseding Indictment.

▮▮▮ Chandler next asserts that Section 657, as applied to him, is unconstitutionally vague and overbroad. Criminal statutes must, of course, be narrowly and strictly construed in favor of the defendant in order to conform to constitutional notions of due process. *United States v. Resnick*, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127 (1936). Fairness dictates that individuals be able to know, within reason, precisely what conduct is proscribed under a criminal statute. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *Smith v. Goguen*, 415 U.S. 566, 575, 94 S.Ct. 1242, 1248–49, 39 L.Ed.2d 605 (1974). A criminal statute must also establish minimum guidelines to prevent law enforcement, prosecutors and juries from pursuing their personal predilections. *Goguen*, 415 U.S. at 575, 94 S.Ct. at 1248–49.

Section 657 provides in relevant part:

Whoever, being an officer ... of ... any savings and loan corporation ... or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... willfully misapplies any moneys [or] funds, ... belonging to such institution, or ... otherwise entrusted to its care, shall be guilty of an offense against the United States.

Chandler argues that the funds involved in the Anthony loan were not "moneys [or] funds ... belonging to" WHS & L. Rather, Chandler asserts that the funds for the loan to Anthony originated with Tri–State of California, an entity which was not insured by FSLIC. Chandler argues the application of Section 657 to the Anthony loan, results in an impermissible delegation of the basic policy decisions denounced in *Grayned* and allows the government to collapse a separate corporate structure in order to criminalize otherwise legitimate conduct. Therefore, Section 657 is unconstitutional because Chandler was deprived of notice that wholly-owned subsidiaries of federally insured savings and loan

institutions were within the ambit of Section 657.

In support of this argument, Chandler cites to *United States v. White*, 882 F.2d 250 (7th Cir.1989). That case is factually distinguishable from this case. The defendant in *White* was charged, under 18 U.S.C. § 1014, with making false statements to a wholly-owned subsidiary of a bank insured under the Federal Deposit Insurance Corporation. The indictment did not include allegations that the defendant attempted to influence the subsidiary's parent, the federally insured bank. Moreover, the defendant in *White* was not accused of taking any money belonging to the bank and he had no relationship with the bank. The *White* court determined that Section 1014 was unconstitutionally vague as applied to the defendant because "there is no (or only the most attenuated) federal stake in preventing fraud against affiliates of a federally insured bank, as distinct from fraud against the bank itself." *White*, 882 F.2d at 253. The court noted that if the defendant had been charged with attempting to influence the bank, as well as its subsidiary, the outcome would be different. *White*, at 254.[4] "It would be enough if White had known that the loan he was getting from the leasing corporation would be assigned to the bank." *Id.*

Here, the funds for the Anthony loan were derived exclusively from WHS & L, a federally insured institution. Thus, the federal stake in protecting federally insured funds is clear. Furthermore, Chandler was accused of taking money from a federally insured institution, as the government established through trial that the funds for the Anthony loan were obtained through WHS & L. Finally, Chandler exercised control over WHS & L and knew that the funds for the Anthony loan (as well as the Furman loan) belonged to WHS & L. He also knew that any loans made by Tri–State of California would be assigned to WHS & L. Contrary to Chandler's assertion, *White* would dictate that the statute as applied to Chandler is not

---

**4.** Although *White* analyzes Section 1014, the court does discuss cases addressing the statute at issue in this case, Section 657, including *Cartwright, supra*. The court in *White* does not dispute the court's finding in *Cartwright*, it merely discusses the fact that the statutes at issue and the facts make the two cases distinguishable.

unconstitutionally vague. Accordingly, we find that Section 657 is neither vague nor overbroad as applied herein.

■ Chandler next attacks his conviction on the ground that he was deprived of the opportunity to secure certain evidence, specifically, the loan file concerning the Anthony loan. Moreover, Chandler asserts that the extension of the applicable statute of limitations from five to ten years violated the *ex post facto* clause of Article 1, Section 9, Clause 3 of the United States Constitution because it exacerbated his efforts to obtain the missing loan file.

During the discovery phase of this case, Chandler requested the documents upon which the Indictment was based. The government turned over its documents, but the file containing the loan documents for the Anthony loan mysteriously disappeared. The government asserts no such file existed, while Chandler presented testimony from an FHLBB auditor, who stated she had examined the file in 1986.

■ Assuming the file existed, there is no denial of due process where the government fails to preserve evidence absent a showing that the government acted in bad faith, there was some exculpatory value inhering in the missing evidence and comparable exculpatory evidence was not reasonably available from other sources. *United States v. Malbrough*, 922 F.2d 458, 463 (8th Cir. 1990), *cert. denied*, 501 U.S. 1258, 111 S.Ct. 2907, 115 L.Ed.2d 1071 (1991). There is nothing in the record before us that satisfies the dictates of *Malbrough*. Thousands of documents were retrieved when WHS & L went into receivership and the loss of a file under such circumstances is negligence, not bad faith. *See, Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988) (failure of police to perform tests on samples that may have provided exculpatory results was negligence, not bad faith). Furthermore, Chandler discovered another source for the contents of the file through the testimony of the FHLBB auditor, who stated the file contained a promissory note, an appraisal for real property and a 1984 income tax return—documents Chandler argued were consistent with a legitimate

loan. Finally, Chandler can only speculate that, had the government given him the Anthony loan file, he would have been acquitted by the jury. Accordingly, we find Chandler was not denied due process because he was not provided the Anthony loan file.

■ Chandler's contention that the amendment of 18 U.S.C. § 3293(1), extending the statute of limitations applicable to Section 657 from five to ten years violates the *ex post facto* clause is likewise without merit. The test developed by the United States Supreme Court for determining violations of the *ex post facto* clause derives from the principle that "central to the *ex post facto* clause prohibition is a concern for the 'lack of fair notice and governmental restraint when the legislation increases punishment beyond what was prescribed when the crime was consummated.'" *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). From this principle, the Court has determined that two elements must be met: the law must apply to events occurring before its enactment; and it must disadvantage the offender affected by it. *Miller*, 482 U.S. at 430, 107 S.Ct. at 2451. The Court has also held that there is no *ex post facto* violation if the law merely changes the modes of procedure that do not affect matters of substance. *Id.* (citation omitted).

■ "The law is settled that '[e]xtending a limitation period before a given prosecution is barred does not violate the *ex post facto* clause.'" *United States ex rel Massarella v. Elrod*, 682 F.2d 688, 689 (7th Cir. 1982), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983). We have previously ruled on this issue and found "Congress, of course, has the power to extend the period of limitations without running afoul of the *ex post facto* clause, provided the [original] period has not already run." *United States v. Madia*, 955 F.2d 538, 539–40 (8th Cir.1992) (citation omitted). The conduct which formed the basis of the indictment occurred in 1985 and Section 3293 was amended in 1989. There was no violation of the *ex post facto* clause either facially or as applied to Chandler, because the amendment

occurred prior to the running of the original period.

Chandler argues that the extension of the statute of limitations is nonetheless unconstitutional in this case as it exacerbated the difficulty in obtaining documents from institutions that had gone into receivership. Chandler provides no support for this argument, however. There has been no showing any document would have been more accessible had the limitations period not been extended.

Finally, Chandler argues that the evidence was insufficient to support his conviction under Count VI. Particularly, Chandler asserts that the government failed to prove three elements of the offense: 1) that he was an officer of WHS & L; 2) that the funds were misapplied; and, 3) that the funds belonged to West Helena.

■ In our review of the district court's denial of Chandler's motion to acquit, we consider the evidence in the light most favorable to the Government and give the government the benefit of all reasonable inferences to be logically drawn from the evidence. *United States v. Powell,* 853 F.2d 601, 604 (8th Cir.1988). The verdict will not be overturned unless "the evidence is such that reasonably-minded jurors must have a reasonable doubt as to the existence of any of the essential elements of the offense." *United States v. Mallen,* 843 F.2d 1096, 1099 (8th Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988).

■ Chandler's assertions concerning the jury's finding that he was an officer of WHS & L are without merit. Chandler asserts that the Superseding Indictment refers to him as an officer of WHS & L, but that the jury was instructed that he was Chairman of the Board of Directors; the difference, according to Chandler, constitutes an unconstitutional constructive amendment of the Indictment.

■ Section 657 imposes liability on anyone "being an officer, agent or employee of or *connected with in any capacity*" who misapplies funds of the bank. Connection with the institution may result from control through stock ownership or through the power to extend credit. *United States v. Davis,* 953 F.2d 1482 (10th Cir.1992), *cert. denied,* 504 U.S. 945, 112 S.Ct. 2286, 119 L.Ed.2d 210 (1992). Chandler owned approximately 31 percent of the stock of WHS & L, and he sat on the loan and investment committees of the institution. There was testimony that Chandler ran board meetings and was relied upon to make and ratify loans. The language of the statute was broad enough to include Chandler and the district court's charge accurately reflected the elements which the jury had to find in order to find Chandler guilty. Accordingly, there was no variance between the Indictment and the proof offered at trial.

■ Chandler also challenges the jury's finding that a misapplication of funds occurred. This attack is two pronged. First, Chandler challenges the jury's finding that the Anthony loan was unauthorized. The district court instructed the jury as follows on this point:

"Misapplication" means the unauthorized or wrongful use of the savings and loans fund. Misapplication includes the wrongful taking or use of money of the savings and loan by an officer or employee for his own benefit or for the use and benefit of some other person.

The term "unauthorized", in this case, means not approved by the Board of Directors or Loan Committee of Tri–State Financial Services of California.

The testimony in this case established that Robert Sly approved the Anthony loan solely at the behest of Chandler. The purpose of the loan was not disclosed; it was not revealed that the loan was ultimately destined for the pockets of Chandler. Moreover, the loan committee of Tri–State consisted of Chandler, Sly and Siegel, hardly an independent body. Moreover, there was no evidence that the board of directors approved the loan. Rather, the evidence tended to show that Sly followed Chandler's directive in wiring the money. We conclude on these facts, it was not unreasonable for the jury to find that the loan was unauthorized.

Chandler's second prong of attack on the jury's finding of misapplication consists of a challenge to the finding that the loan was unlawful. The challenge is without merit for it is well settled that loans by an officer of a financial institution for his benefit are, at best, problematic. This is particularly so where the officer or employee of the institution conceals his beneficial interest in the loan. *See United States v. Krepps*, 605 F.2d 101 (3d Cir.1979); *United States v. Rochester*, 898 F.2d 971 (5th Cir.), *reh'g denied*, 903 F.2d 826 (5th Cir.1990) (conviction upheld under Section 657 where loan to credit worthy developer was used to fund construction project where defendant, a former director, had an undisclosed interest); *United States v. Walker*, 871 F.2d 1298 (6th Cir. 1989); *United States v. Bailey*, 859 F.2d 1265 (7th Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989). We have held that the financial condition of the putative borrower is irrelevant where a financial institution officer makes the loan intending to benefit from the proceeds and conceals his interest from the financial institution. *United States v. Steffen*, 641 F.2d 591, 597 (8th Cir.1981), *cert. denied*, 452 U.S. 943, 101 S.Ct. 3091, 69 L.Ed.2d 959 (1981). See also, *United States v. Austin*, 823 F.2d 257, 259 (8th Cir.1987), *cert. denied*, 484 U.S. 1044, 108 S.Ct. 778, 98 L.Ed.2d 864 (1988) (evidence sufficient where proceeds of loan funnelled to financial institution via wire transfers).

The evidence adduced at trial established that Chandler received the proceeds of the Anthony loan and concealed that he was, in fact, the true recipient of the proceeds. Viewing the evidence in the light most favorable to the government, the evidence established that the Anthony loan was within the ambit of Section 657.

Finally, Chandler challenges the finding of the jury that the funds in question belonged to WHS & L. As we have previously established, the funds plainly and incontrovertibly belonged to the WHS & L. Accordingly, we find no error in the District Court's refusal to dismiss Count VI of the Indictment.

Counts IX and X of the Superseding Indictment concern the reciprocal loans made between Chandler and Furman. The version of 18 U.S.C. § 215 in effect at the time of the transactions at issue prohibited the following:

(a) Whoever, being an officer, director, employee, agent, or attorney of any financial institution, bank holding company, or savings and loan holding company, except as provided by law, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value, for himself or for any other person or entity, other than such financial institution, from any person or entity, other than such financial institution, from any person or entity for or in connection with any transaction or business of such financial institution; or

(b) whoever, except as provided by law, directly or indirectly, gives, offers, or promises anything of value to any officer, director, employee agent, or attorney of any financial institution, bank holding company, or savings or loan holding company, or offers or promises any such officer, director, employee, agent, or attorney to give anything of value to any person or entity, other than such financial institution, for or in connection with any transaction or business of such financial institution, shall be fined not more than $5,000 or three times the value of anything offered, asked, given, received, whichever is greater, or imprisoned not more than five years, or both; but if the value of anything offered, asked, given, received, or agreed to be given or received does not exceed $100, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Initially, Chandler challenges the court's jurisdiction and the venue of the district court sitting in the Eastern District of Arkansas. The evidence at trial revealed that the funds for the Furman loan originated with WHS & L. The loan was entered into WHS & L's books as a loan to Tri–State to fund a real estate loan. Chandler asserts that the entry in the loan journal of WHS & L was a mistake; he characterizes the transaction as an investment in Tri–State. The characterization of the transaction by Chandler is not dispositive, nor is it convincing.

Indeed, we think, as did the jury and the district court, that the characterization of the loan in the loan journal of WHS & L determines this issue.

■ Chandler also argues that the Furman loan was not a continuing offense under 18 U.S.C. § 3237(a) which provides:

> any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Counts IX and X were, in fact, unitary activities and are only viewed properly in that context. Chandler's argument that the conduct supporting Counts IX and X does not support the exercise of jurisdiction in the Eastern District of Arkansas is simply wrong. Chandler's acceptance of the gratuitous loan from Furman in Houston was inextricably linked to the decision to make the Furman loan. The district court's jurisdiction in this matter was triggered by the loan to Furman which originated at WHS & L in the Eastern District of Arkansas. To require the district court to sever a unitary transaction is to elevate form over substance. There is no requirement to do so and we decline to require the severance of the inextricably linked conduct.

■ The government has the burden of proving correctness of venue by a preponderance of the evidence. *United States v. Eder*, 836 F.2d 1145, 1148 (8th Cir.1988) Proper venue may be established by either direct or circumstantial evidence. *United States v. Kiser*, 948 F.2d 418 (8th Cir.1991), *cert. denied*, 503 U.S. 983, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992). Venue is a question of fact for the jury. *United States v. Redfearn*, 906 F.2d 352 (8th Cir.1990). We find that the jury could reasonably find that the gratuity in this case, the funds for the Furman loan, originated in WHS & L. Accordingly, the district court properly exercised jurisdiction in this matter.

■ Chandler next challenges the district court's denial of his motion to dismiss Counts IX and X of the Superseding Indictment because the Indictment included language that was not added to Section 215 until two months after the alleged criminal conduct occurred. The conduct upon which Counts IX and X are based occurred on July 16, 1986. The Superseding Indictment includes the language "intending to influence or reward", which was not added to Section 215 until September 3, 1986. Chandler argues the Indictment should have included "corrupt", but as the district court correctly noted, the term "corrupt" was not added to the statute until August 1986, after the conduct complained of here.

■ Although the Superseding Indictment includes language not provided in the criminal statute, "an indictment is considered sufficient if it fairly informs the accused of the charges against him and allows him to plead double jeopardy as a bar to future prosecution" *United States v. Mastrandrea*, 942 F.2d 1291, 1293 (8th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992). Moreover, "when the indictment fully notifies the defendant of the charges to be met at trial and an amendment results only in a narrowing of criminal liability, the variance is not a fifth amendment violation." *United States v. Copple*, 827 F.2d 1182, 1188 (8th Cir.1987), *cert. denied*, 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988).

Here, by including the language "intending to influence or reward", the government was required to prove more than it would have under the language of the statute as it existed at the time of the conduct. We find no error in the district court's refusal to dismiss Counts IX and X of the Superseding Indictment on this basis.

■ Chandler also argues that, at the time of the offense, Section 215 allowed for the affirmative defense which provided that a defendant could not be found guilty if his actions were otherwise lawful. Chandler also argues Section 215 at the time of the offense is void for vagueness because it covers conduct that is both lawful and unlawful. In evaluating voidness claims, the Supreme Court has instructed that:

> Void for vagueness simply means that criminal responsibility should not attach

where one could not reasonably understand that his contemplated conduct is proscribed. In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct which a defendant is charged ...

*United States v. National Dairy Corp.*, 372 U.S. 29, 32–33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561 (1963). The proscribed conduct under Section 215 was the exchange of anything of value with an officer of a federally insured financial institution in connection with the business of that institution. Chandler seems to argue that because he used another route for the exchange of things of value, he was not on notice that his conduct was proscribed. If, however, Chandler was wholly unaware of the prohibition on exchanges, the circuitous and clandestine methods used to engage in these transactions were superfluous. We cannot ignore the fact that Chandler concealed each facet of the Furman transactions. That he hid the arrangements and made the transfers as he did is indicative that he was aware that the transactions were proscribed. *See United States v. Mayfield*, 999 F.2d 1497, *reh'g denied*, 11 F.3d 169 (11th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1222, 127 L.Ed.2d 568 (1994); *United States v. Kelly*, 973 F.2d 1145 (5th Cir.1992).

■ There is sufficient evidence to support Chandler's conviction under Counts IX and X of the Indictment, despite his contentions to the contrary. Chandler asserts that the government failed to prove that there was some overt agreement between Furman and Chandler. The government was not required to prove more than the fact that there was a gratuity that was connected to the business of the financial institution. *See United States v. Humble*, 714 F.Supp. 794, 796 (E.D.La.1989); *United States v. Holley*, 23 F.3d 902, 909 (5th Cir.1994) (credit worthiness of borrower will not insulate bank officer from charges of bank fraud). The critical issue in this case involved whether there was a gratuity given and/or received which gratuity was offered and/or received in connection with the business of the financial institution. The evidence supports the jury's finding.

Accordingly, the judgment of the District Court is AFFIRMED.