# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 04-2004

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

WILLIAM L. BIANUCCI,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 02 CR 583—**Charles R. Norgle, Sr.**, *Judge.*

———————

ARGUED MAY 12, 2005—DECIDED JULY 29, 2005

———————

Before RIPPLE, ROVNER and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury found William Bianucci
guilty of one count of bank fraud in violation of 18 U.S.C.
§ 1344, and thirteen counts of making false statements to
a bank in violation of 18 U.S.C. § 1014. Bianucci appeals
both his conviction and his sentence. We affirm the con-
viction but order a limited remand for further proceedings
on his sentence under the procedure established in
*United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir.
2005).

## I.

Bianucci was the controller for Erickson Cosmetics Corporation ("ECC"), a Chicago-based contract manufacturer of cosmetic products. As controller, Bianucci was responsible for the day-to-day management of the finances of ECC. He reported to the company's president, James Pickering, his co-defendant in this case. ECC was a privately held and sometimes financially troubled company. In 1994, before Bianucci was hired, ECC was in Chapter 11 bankruptcy. ECC's owner, Wallace Erickson, hired Pickering to lead the company out of bankruptcy. Pickering hired Bianucci to work as ECC's controller in 1996. In this role, Bianucci oversaw accounting functions, payroll, costing, accounts receivable, accounts payable, inventory, and credit.

In 1997, ECC's lender, American National Bank, declined to renew a credit line for ECC and Bianucci was responsible for finding a new lender. Bianucci contacted First Bank National Association ("First Bank") with whom Erickson had a prior banking relationship. First Bank referred the loan request to Republic Acceptance Corporation ("Republic"). Republic had been an unregulated commercial finance company specializing in loans to small businesses until First Bank purchased Republic in 1993. The government's witnesses variously described Republic as a "division," "part," or "subsidiary" of First Bank. One government witness labeled Republic "the name used for the asset lending part of the bank." Republic became subject to banking regulations when First Bank acquired it. According to government witnesses, when Republic made a loan, First Bank provided the money. When a loan serviced by Republic went bad, it was the bank that lost money.

On May 14, 1997, ECC entered into a Financing Agreement with First Bank. Pickering signed the Financing Agreement in his capacity as president of ECC. Barry Davis

signed for First Bank using the title "Account Executive." The very first line of the agreement identifies First Bank as the lender. Nonetheless, many of the people who negotiated the terms of the Financing Agreement on behalf of First Bank held job titles at Republic as well as at the bank. At trial, some of the government's witnesses testifying about the loan negotiations identified First Bank as their employer, some named Republic, and one identified both First Bank and Republic as his employer (First Bank in direct testimony and Republic in cross-examination). Although the corporate structure of First Bank and Republic was undoubtedly confusing to its employees and customers, the Financing Agreement at issue here clearly identified First Bank as the lender. A Security Agreement signed by Pickering on behalf of ECC that same day identified the secured party as First Bank. First Bank later merged with U.S. Bank and the combined entity was named U.S. Bank. For the sake of clarity and because much of the subsequent paperwork referred to U.S. Bank, we will refer to the bank as U.S. Bank hereafter.

The Financing Agreement provided for a revolving line of credit for ECC. In this kind of loan arrangement, the borrower may request cash advances on a day-to-day basis provided that the bank determines there is enough collateral to secure the loan. The loan from U.S. Bank to ECC was secured in part by a percentage of eligible accounts receivable that would be assigned by ECC to the bank. The original Financing Agreement permitted ECC to borrow up to $6 million on the basis of then-existing eligible accounts receivable. The Financing Agreement was subsequently amended four times to increase the amount of money that ECC was permitted to borrow to $14 million. Each of those amendments identified the bank as the lender. Under the terms of the Financing Agreement, ECC was prohibited from borrowing against certain types of accounts receivable that were not considered to be good collateral. For example,

ECC could not borrow against accounts receivable that were unpaid for more than ninety days. Nor could ECC borrow against any accounts receivable balances owed by a particular customer if 20% or more of accounts receivable owed by that customer were ineligible. For example, if 20% of a customer's account with ECC was more than ninety days old, ECC could not borrow against the remaining 80% of the customer's accounts receivable even if that balance was otherwise eligible. Additionally, ECC could not borrow against billings based on partial completion of a project, and could not borrow against accounts where no services had yet been performed and no products had yet been delivered.

In order for the bank to monitor the loan, the Financing Agreement required ECC to submit to U.S. Bank various records documenting the eligible accounts receivable. The key documentation was a form called a "borrowing base certificate" or "BBC." ECC submitted a new BBC each time ECC requested a new advance of funds. ECC would list on the BBC any new invoices generated by the company since the last BBC had been submitted. The new invoices (or accounts receivable), if eligible under the Financing Agreement, provided collateral for additional funds that would be available to ECC for loans. ECC submitted invoice registers rather than copies of the invoices themselves in support of the billing figures on the BBCs. Once submitted on a BBC, an account was assigned to U.S. Bank to increase the collateral on the line of credit. With each BBC, ECC conveyed to U.S. Bank the company's current accounts receivable so that the bank could calculate from day to day the amount of funds available for advances on the line of credit.

As the controller of ECC, Bianucci was responsible for certifying the accuracy of the BBCs. The BBC forms were labeled "Republic Acceptance Corporation" and were sub-

mitted to Republic. The bottom of each BBC contained a signature block preceded by the following language:

> TO REPUBLIC ACCEPTANCE CORPORATION: In compliance with the Financing Agreement between us we hereby certify that the above is true and correct, and that each schedule of or other information concerning our inventory, accounts, instruments, chattel paper, and other rights to payment of money that are attached hereto are true and correct, in each case as of the date specified in the Borrowing Base Certificate. We hereby acknowledge and agree that you have a security interest in all of our inventory, accounts, instruments, chattel paper, other rights to payment of proceeds thereof, together with any other assets covered by our Security Agreement(s) with you. Except as otherwise specifically stated with respect to a particular item, we warrant that all listed receivable items are genuine, that the amount set opposite each debtor's name is the true, correct, collectible, noncontingent and undisputed amount owing by such debtor, and that none of said items is subject to any defense at law or inequity [sic], to any offset, or to contra account. We hereby further certify that we have no knowledge of the existence of any breach or default of any representations, warranties or agreements with you, as set forth in the Financing Agreement, the Security Agreement(s) and any other agreement between you and us, except as described in a separate attachment to this Certificate.

Gov. Ex. U.S. Bank Group #4a. Bianucci signed the certifications at the end of each BBC in his capacity as Controller of ECC. The Financing Agreement also required ECC to produce accounts receivable aging reports. These reports listed accounts receivable by invoice date or due date so that the lender could determine which accounts were ineligible to serve as collateral for the loan.

In spring 1998, ECC had cash flow problems and could not pay its bills in a timely way. In order to increase the amount of money ECC could borrow under the Financing Agreement, Pickering told Bianucci that it was time to "get creative." Pickering discussed with Bianucci "re-aging" accounts receivable and creating false invoices to support the BBCs. By re-aging accounts, some accounts that would have been ineligible to serve as collateral appeared to the bank to be eligible. The false invoices deceived the bank into believing that additional loans would be collateralized by legitimate, collectible invoices. Bianucci signed certifications on more than a dozen BBCs that contained false information. As a result, the bank advanced more funds to ECC than it would have advanced had it known the true state of affairs.

In September and October of 1998, collateral analyst Jeff Alderson conducted an audit of ECC and discovered that $4 million in loaned funds were unsupported by legitimate collateral. The bank confronted Pickering and Bianucci with this news and informed the pair that there was not enough money in ECC's account to cover the company's then-current payroll obligations. Neither Pickering nor Bianucci explained to the bank how such a large amount of the loan was unsupported by legitimate collateral. Two months after the audit results were announced, ECC fired Pickering, who was eventually charged, along with Bianucci, with bank fraud and making false statements to a bank. Pickering faced an additional charge related to unauthorized loans that he took from ECC's coffers and never paid back. Bianucci was charged with one count of bank fraud in violation of 18 U.S.C. § 1344, and sixteen counts of making false statements to a bank in violation of 18 U.S.C. § 1014. Pickering pled guilty and testified against Bianucci at trial. A jury convicted Bianucci of one count of bank fraud and thirteen counts of making false statements to a bank and acquitted him on three counts of making false statements to a bank. Bianucci appeals.

## II.

On appeal, Bianucci contends that the government produced insufficient evidence to demonstrate that he intended to influence an FDIC-insured bank when he submitted the BBCs to Republic, which was not a bank. He asks this court to reverse his conviction and remand with directions to acquit on all counts. He also challenges his sentence on the grounds that the district court treated the Sentencing Guidelines as binding rather than advisory, in violation of the Fifth and Sixth Amendments to the Constitution. We turn first to Bianucci's challenge to his conviction.

## A.

We have often described challenges to the sufficiency of the evidence as "uphill battles" and this one is no exception. In reviewing Bianucci's claim, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Fleischli*, 305 F.3d 643, 657 (7th Cir. 2002), *cert. denied*, 538 U.S. 1001 (2003); *United States v. Copus*, 93 F.3d 269, 271 (7th Cir. 1996); *United States v. Reynolds*, 64 F.3d 292, 297 (7th Cir. 1995), *cert. denied*, 516 U.S. 1138 (1996). We may reverse a conviction only when the record is devoid of evidence, regardless of how it is weighed, from which a reasonable jury could find guilt beyond a reasonable doubt. *Fleischli*, 305 F.3d at 657; *Copus*, 93 F.3d at 271; *United States v. Rodriguez*, 53 F.3d 1439, 1444 (7th Cir. 1995). We will not reweigh the evidence or judge the credibility of the witnesses. *Reynolds*, 64 F.3d at 297. Section 1014 provides, in relevant part:

> Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are

> insured by the Federal Deposit Insurance Corporation . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1014. Section 1344, the other statute under which Bianucci was charged, similarly provides criminal penalties for persons who knowingly execute a scheme to defraud a financial institution. 18 U.S.C. § 1344.

Bianucci maintains that he dealt entirely with Republic, a company separate from U.S. Bank that was not itself a bank, did not take deposits, and was not insured by the FDIC. He sent the BBCs to Republic, not the bank, and the information on the BBCs was therefore intended to influence Republic, not the bank. Bianucci argues that, under our decision in *United States v. White*, 882 F.2d 250 (7th Cir. 1989), his conviction may not stand because the government did not prove beyond a reasonable doubt that he intended to influence the bank when he submitted the BBCs but rather intended to influence Republic, a non-bank entity. Some of the evidence certainly supports Bianucci's version of events. One of the first documents to exchange hands on the loan was a letter from Michael Pierce (who carried a business card identifying him as an employee of Republic) to Bianucci describing the general terms and conditions that Republic might extend to ECC. The letter, which clarifies that it is for discussion purposes only, is on Republic Acceptance Corporation letterhead. The attached term sheet, describing the particulars of the proposed loan, lists the lender as Republic Acceptance Corporation, and states that a collateral account is to be established for the benefit of Republic. All of the BBCs are titled "Republic Acceptance Corporation," and the signature certification block (signed repeatedly by Bianucci) begins with the words, "TO REPUBLIC ACCEPTANCE CORPORATION." Gov. Exs. U.S. Bank Group 4a - 13a, 15a, 16a, 18a, 19a. At trial, Jeff Alderson, a government witness and collateral analyst, first testified that he was employed by U.S. Bank

but on cross-examination admitted that Republic was his employer. He also conceded that the money advanced to ECC was paid by Republic, that ECC had approached the bank first for the loan and had been referred to Republic, that the loan was "totally a loan by Republic," and that the bank decided not to exercise an option it had to participate in up to 50% in the loan.

These were all points for Bianucci to argue to the jury, just as the government was allowed to argue the evidence that supported its version of events, namely that the Financing Agreement and all subsequent amendments to it were signed by ECC and the bank (first by First Bank and later by U.S. Bank), and that as Controller of ECC, Bianucci undoubtedly knew he was dealing with a bank when he sent the BBCs to Republic, which was simply servicing the loan for the bank. The government had much evidence demonstrating its view of the facts. For example, the term sheet also specified as a condition precedent:

> Completion of all documentation (filing and financing agreement to be under the name of First Bank) and resolution of the final terms of the financing in a manner satisfactory to Republic and Republic's counsel.

Gov. Ex. Erickson Group 1. Most conclusive is the Financing Agreement itself, together with the Security Agreement and four separate Amendments to the Financing Agreement. These documents, which controlled the entire loan arrangement, identified First Bank and later U.S. Bank as the lender and as the secured party in each and every final, executed draft. Bianucci himself testified that the Financing Agreement identified the bank as the lender and that he read the complete Financing Agreement at the time it was signed. The jury was entitled to infer from the documents, from Bianucci's position as Controller at ECC, and from the testimony of Bianucci and other witnesses including co-defendant Pickering, that Bianucci knew ECC

was dealing directly with the bank and that the BBCs were intended to induce the bank to advance more funds to ECC. That is all the government needed to prove and there was more than sufficient evidence in the record to meet this element of the charge. The jury simply did not credit Bianucci's testimony that he believed he was dealing with Republic, a non-bank, non-FDIC-insured entity when he certified the BBCs.

Our opinion in *White* does not aid Bianucci. The defendant in that case was convicted of violating section 1014 by making knowingly false statements to a leasing corporation that was a wholly-owned subsidiary of a bank. *White*, **882 F.2d at 250-51.** The indictment against White did not charge that White made the statements to the leasing company intending to influence its parent, the bank; rather, the indictment charged that White made the statements intending to influence the leasing company. *White*, **882 F.2d at 251.** The question thus presented to the court was whether the subsidiary leasing corporation also qualified as an FDIC-insured bank within the meaning of section 1014. We rejected the government's argument that we should treat the subsidiary as if it were a bank because federal regulations subjected it to all banking laws and regulations. *White*, **882 F.2d at 252.** We found there was "no (or only the most attenuated) federal stake in preventing fraud against affiliates of a federally insured bank, as distinct from fraud against the bank itself." *White*, **882 F.2d at 253.** We clarified our decision:

> [I]f White had intended by making false statements to the leasing corporation to influence the bank as well, the fact that the statements were not made to the bank would not prevent his conviction; the language of the statute is clear on this point. Nor would the intent to influence the bank have to be the primary motivation for the making of the statements. It would be enough if White had known that the loan he was getting from the

leasing corporation would be assigned to the bank. But the government proposed no such theory of liability in this case. It was content to show that White made false statements to influence the leasing corporation. It staked its all on persuading the district court and us that the leasing corporation is a bank.

*White*, 882 F.2d at 254 (citations omitted).

Unlike White, Bianucci was charged with making false statements for the purpose of influencing the bank to advance funds to ECC. As we have described above, there is sufficient evidence to show that Bianucci knew the bank was identified as the lender, and that, although Republic may have been servicing the loan, the bank was advancing the money. The jury was entitled to infer that when Bianucci sent BBCs to Republic, he intended for that information to influence the bank and in particular to cause the bank to advance more funds to ECC. The government did not stake its case on proving that Republic was an FDIC-insured entity but rather on demonstrating that Bianucci, as Controller of ECC, knowingly submitted false BBCs with the intent to influence First Bank and later U.S. Bank, the lenders identified in the Financing Agreement. We thus affirm Bianucci's conviction.

## B.

The district court sentenced Bianucci to forty-six months' imprisonment, to be followed by five years of supervised release. The court also ordered Bianucci to pay $3,418,854 in restitution and a $1400 assessment. In calculating Bianucci's sentence, the district court accepted the recommendations of the Presentence Investigation Report ("PSR"), which set the base offense level at six, added two points for more than minimal planning, two more points for obstruction of justice, and thirteen points for the amount of loss to the victim, resulting in an adjusted offense level of

twenty-three. Bianucci did not object to the proposed Guidelines calculations, although he did move for a three-level downward departure and also objected to the sentencing disparity between himself and his co-defendant, James Pickering who received a twenty-seven month prison term. The court denied the motion for a downward departure, which resulted in a Guidelines range of forty-six to fifty-seven months' imprisonment. The court selected a sentence at the low end of that range, noting there were "many good things to say about Mr. Bianucci." In sentencing Bianucci, the district court treated the Sentencing Guidelines as binding. Bianucci did not allege a constitutional violation or object to his sentence on *Apprendi* grounds at that time.

On appeal, Bianucci argues that his sentence violated the Supreme Court's dictate in *United States v. Booker*, 125 S. Ct. 738 (2005). Under *Booker*, any fact other than a prior conviction that increases the maximum penalty established by a jury verdict or guilty plea must be admitted by the defendant or proved to a jury beyond a reasonable doubt. *Booker*, 125 S. Ct. at 756. Here, the court increased Bianucci's sentence with facts not found by the jury or admitted by the defendant. In particular the court made findings related to the amount of the loss to the bank, the degree of planning needed to commit the crime, and Bianucci's obstruction of justice. Although Bianucci asked the court to depart downward and to impose a "just punishment" lower than the bottom of the Guidelines range, Bianucci did not preserve a *Booker*-type argument and we therefore review the sentence for plain error. *See United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005). It is unclear from the record as it now stands whether the district court would have imposed the same sentence had it been aware that the Guidelines were to be treated as advisory rather than mandatory.

We therefore order a limited remand to permit the sentencing judge to determine whether he would have imposed

a different sentence had he known that the Guidelines were merely advisory rather than mandatory. *Paladino*, 401 F.3d at 483-84; *United States v. Mykytiuk*, 402 F.3d 773, 779 (7th Cir. 2005). The district court judge should follow the procedure we outlined in *Paladino*. That is, the court should obtain the views of counsel, at least in writing, but need not require the presence of the defendant. On reaching a decision whether to resentence, the district court must either place on the record a decision not to resentence, with an appropriate explanation or inform this court of its desire to resentence the defendant. *Mykytiuk*, 402 F.3d at 779; *Paladino*, 401 F.3d at 484. If the district court indicates that it wishes to resentence Bianucci, this court will vacate the sentence and remand for resentencing. At that point, the district court must, with the defendant present, resentence in accordance with the Supreme Court's *Booker* decision and all relevant provisions of the Sentencing Reform Act. *See* 18 U.S.C. § 3553. During the limited remand, this court will retain jurisdiction over the case. *See United States v. Williams*, 410 F.3d 397, 404 (7th Cir. 2005).

## III.

We AFFIRM Bianucci's conviction. However, because the court sentenced Bianucci believing that the Sentencing Guidelines were binding rather than advisory, we order a LIMITED REMAND so that the district court may determine whether it would be inclined to sentence Bianucci to a lesser prison term knowing that it has the discretion to do so after *Booker*. We retain appellate jurisdiction pending the outcome of this remand.

**A true Copy:**

      **Teste:**

                         _____
                         *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*